**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| KENNETH KOEPPLINGER and RHODA SMITH, on behalf of themselves and others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )     1:17cv995 |
| | ) |
| SETERUS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Plaintiffs' Motion for Partial Summary Judgment" (Docket Entry 50) ("Plaintiffs' Motion"), "Defendant Seterus, Inc.'s Motion for Summary Judgement Against Plaintiff Kenneth Koepplinger" (Docket Entry 54) ("Defendant's First Motion"), "Defendant Seterus, Inc.'s Motion for Summary Judgement Against Plaintiff Rhoda Smith" (Docket Entry 55) ("Defendant's Second Motion"), and "Plaintiffs' Motion for Class Certification" (Docket Entry 52) (the "Certification Motion"). For the reasons that follow, the Court should grant in part and deny in part Defendant's First Motion, Defendant's Second Motion (collectively, "Defendant's Motions"), Plaintiffs' Motion (collectively with Defendant's Motions, the "Summary Judgment Motions"), and the Certification Motion.

## BACKGROUND

### I.  Procedural Background

Kenneth Koepplinger ("Koepplinger") initiated this putative class action against Seterus, Inc. (the "Defendant"), alleging violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. (the "FDCPA"), the North Carolina Collection Agency Act, N.C. Gen. Stat. § 58-70-1 et seq. (the "NCCAA"), the North Carolina Debt Collection Act (the "NCDCA"), N.C. Gen. Stat. § 75-50 et seq., and/or the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq. (the "UDTPA"), related to a series of debt collection letters that Defendant sent to certain mortgagors in North Carolina. (See Docket Entry 16 (the "Amended Complaint"), ¶¶ 1-5, 18, 35.)  Maintaining that Koepplinger "fail[ed] to state a claim upon which relief can be granted," Defendant moved to dismiss this lawsuit under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"). (Docket Entry 18 (the "Dismissal Motion") at 1.)[1] As Koepplinger's "Amended Complaint sufficiently alleges violations of the FDCPA, NCCAA, NCDCA, and UDTPA to survive Rule 12(b)(6) dismissal," however, the undersigned United States Magistrate Judge recommended that the Court deny the Dismissal Motion. (Docket Entry 24 at 28.) The Court (per United States District Judge Catherine C. Eagles)

_____

    1  Citations herein to Docket Entry pages use the CM/ECF footer's pagination.

adopted that recommendation, denying the Dismissal Motion. (See Docket Entry 26 at 1.)

The Court (per the undersigned) thereafter entered a Scheduling Order (see Text Order dated Nov. 27, 2018), which, inter alia, established a deadline of April 1, 2019, for amending the pleadings or adding parties (see Docket Entry dated Nov. 27, 2018). Prior to that deadline, Koepplinger sought leave to amend his pleading to add Rhoda Smith ("Smith," and collectively with Koepplinger, the "Plaintiffs") as a plaintiff (see Docket Entry 36 at 1), a request to which Defendant consented (see Docket Entry 38 at 1). Plaintiffs accordingly filed a Second Amended Complaint, which raises the same general claims as Koepplinger's earlier complaints. (Compare Docket Entry 39, with Docket Entry 16, and Docket Entry 1.) After completing discovery, the parties filed their Summary Judgment Motions and Plaintiffs filed their Certification Motion. (See Docket Entries 50, 52, 54, 55.)

## II. Factual History

As relevant to the pending motions, the record reflects the following:

### A. Plaintiffs' Allegations

According to the Second Amended Complaint:

Defendant "is a servicer of mortgages for residential housing loans owned, backed, or controlled by [the Federal National Mortgage Association ("Fannie Mae")]" (Docket Entry 39, ¶ 19),

3

including the mortgages on Plaintiffs' homes (see id., ¶¶ 28, 42).[2] Defendant obtained servicing rights to Plaintiffs' mortgages "while [they were] in a state of default," rendering Defendant "a 'debt collector' as that term is defined by 15 U.S.C. § 1692a(6)" of the FDCPA. (Id., ¶ 15.) In addition, Defendant "is a 'collection agency' as defined by the [NCCAA]" (id., ¶ 16) or, alternatively, "a 'debt collector,' as defined by the [NCDCA]" (id., ¶ 17).

Defendant "earns money based upon a percentage of the funds that it collects from consumers' mortgage payments as well as through the assessment of late fees and other penalties." (Id., ¶ 20.) Defendant services "hundreds of thousands of loans throughout the United States" (id., ¶ 21), but, "[b]ecause it does not originate" consumer mortgages, Defendant "only becomes involved with a customer if it acquires the servicing rights to a portfolio of loans from Fannie Mae or if Fannie Mae agrees to allow

---

2 The record reflects that Koepplinger sold the home at issue during the pendency of this lawsuit, satisfying his mortgage. (See Docket Entry 51-7 at 12 (11:1 to 11:22).) The record further reflects that, also during the pendency of this lawsuit, another entity purchased Defendant (see Docket Entry 51-1 at 33-35 (32:21 to 34:19), 68-70 (67:18 to 69:7)) and, around the same time, Fannie Mae terminated its servicing contract with Defendant (see id. at 68-69 (67:25 to 68:17)). For simplicity's sake, as it does not impact resolution of the pending motions, this Opinion will adopt the parties' use of the present tense in referring to Defendant, its business practices, and its relationship with Fannie Mae. (See, e.g., Docket Entry 51 at 3 ("[Defendant] services all loans pursuant to agreements with Fannie Mae."); Docket Entry 58 at 22 ("[Defendant] is not a 'collection agency' subject to the NCCAA because it does not solicit claims from more than one entity. Rather, [Defendant] solicits delinquent claims from only one entity — [Fannie Mae]." (citations omitted)).)

4

[Defendant] to purchase the servicing rights to a portfolio of loans from another servicer" (id., ¶ 24). Many of the loans contained in a particular loan portfolio "are delinquent when [Defendant] acquires the rights to the portfolio" (id., ¶ 25) and other loans become delinquent during Defendant's "servicing of the loans" (id., ¶ 26).

"Upon information and belief, when loans for North Carolina customers become more than 45 days delinquent, [Defendant] sends a letter that it refers to as a[n] 'NC Final Letter' to coerce and intimidate the borrower into paying the entire default amount of the loan." (Id., ¶ 27.) The NC Final Letter states, inter alia:

> "If full payment of the default amount is not received by us . . . on or before the Expiration Date, **we will accelerate** the maturity date of your loan and upon such acceleration the ENTIRE indebtedness of the loan, including principal, accrued interest, and all other sums due thereunder, shall, at once and without further notice, become immediately due and owing."

The NC Final Letter further states:

> ["]If you send only a partial payment, the loan still will be in default and we may keep the payment and **still will** accelerate the maturity date.["]

(Id., ¶ 52 (citation omitted) (emphasis and ellipsis in original).) As such, "[t]he NC Final Letters cause borrowers, including [Plaintiffs], to believe that they are at risk of acceleration and foreclosure if all arrearages to [Defendant] are not paid within the time period identified in the Letter." (Id., ¶ 59; see also id., ¶ 60 ("The NC Final Letters cause borrowers to believe that

5

they will lose their homes if they do not become current on their loan within the time period identified in the Letter.").)

In this regard,

> [t]he NC Final Letters create a false sense of urgency by threatening to accelerate the entire indebtedness of a consumer's loan if "full payment of the default amount is not received . . . on or before the Expiration Date," when [Defendant's] actual policy, attested to by a Rule 30(b)(6) Deponent, is to **never** accelerate a loan that is less than 45 days delinquent.

(Id., ¶ 54 (emphasis and ellipsis in original).) "The following is a relevant portion of" the referenced deposition (id., ¶ 55):

> Q. My understanding of your testimony just now is that if [Defendant] receives a payment in response to an NC Final, then the debt is no longer 45 days due and so that's sufficient to hold off the acceleration process?
> A. That's correct.
>
> Q. Okay. And is that -- is that [Defendant's] policy just with regard to North Carolina?
> A. That's [Defendant's] policy for the loans where we are accepting payments and we're able to apply full contractual payment to the loan.
>
> Q. Okay. So in response to a letter like Exhibit [O], [Defendant's] policy, if they're accepting payments, is if they receive an amount equal to a normal monthly payment, they will not accelerate the debt?
> A. As long as, right, it brings the loan less than 45 days due.
>
> Q. Okay. Where does it say that in this letter that if you make one payment or enough such that one payment is recorded, we won't do this, or does it say that?
> A. Well, the [E]xpiration [D]ate provides really the -- the timeline where the customer needs to make some sort of payment so that the 45 days are not past due.
>
> Q. Not some sort of payment, $3,204.72, that's what it says, right?
> A. Yes. And we're allowing the customer, we're also -- yes. We would like the $3,204.72. But our objective is

6

not to foreclose on our customers. Our objective is to be able to take -- even if it's a partial payment, if where -- if they're in the bucket where a partial payment can be made, our objective is to collect that payment to help them stay in their house. Because them making payments, staying in their house helps us in our business as well. Foreclosing on them is really not, you know, helpful to us nor to them.

Q. Yeah.
A. And so therefore, this letter is sent out per the guidelines that are outlined and we allow the customer -- we allow the customer to make that partial payment. And then when a full -- if a partial payment does not equal the contractual payment, then your -- then this letter still -- still stands. But because a contractual payment is able to be applied to the loan account, then we don't have to continue with the -- this letter.

(Id.)

Moreover, "[u]pon information and belief, [Defendant] will not accelerate borrowers' loans and proceed to foreclosure even if the borrower fails to make a payment equal to the default amount listed in the NC Final Letter *and* fails to make any payments that come due during the notice period." (Id., ¶ 56 (emphasis in original).) "Put simply, [Defendant] does not accelerate loans in the manner threatened by its NC Final Letter in the usual course of business." (Id., ¶ 57.) "The NC Final Letters misrepresent the conditions under which [Defendant] intends to accelerate loans and materially deceive consumers into believing their loans *will* be accelerated if they fail to fully cure their default prior to the Expiration Date." (Id., ¶ 58 (emphasis in original).)

"The NC Final Letters misrepresent [Defendant's] intentions and present consumers with a false ultimatum that they satisfy all

7

arrearages within the false deadline identified in the NC Final
Letter, or face acceleration and ultimately foreclosure." (Id.,
¶ 61.)[3]  "The NC Final Letters are materially misleading in that
they threaten consumers, including [Plaintiffs], with acceleration
and foreclosure when [Defendant] has neither the present intent,
nor the present ability, to undertake such actions." (Id., ¶ 62.)
"The[se] empty threats of acceleration and foreclosure . . . are
clearly designed to scare and intimidate individuals into paying
delinquent amounts" (id., ¶ 63) and may "caus[e] individuals,
including [Plaintiffs], to send additional money to [Defendant]
that, absent the false and misleading statements, they could have
utilized on other necessary expenditures, including food and
utility payments" (id., ¶ 64).  "The empty threats of acceleration
and foreclosure are designed to scare consumers into making
payments they otherwise may not" (id., ¶ 66) and "make it
impossible for a consumer to make a rational decision in response
to the NC Final Letter because it threatens immediate, irreversible
consequences" (id., ¶ 65).

---

3  In this regard, the NC Final Letter specifies, inter alia,
"[a]cceleration of the sums secured by the mortgage also may result
in the sale of the premises.  Any such action will not take place
before 45 days from the date of this notice. . . .  If the default
is not cured on or before the Expiration Date, [Defendant] and the
Loan Owner . . . may proceed without further notice to commence
foreclosure proceedings."  (Docket Entry 39-1 at 2 (all-cap font
omitted).)

"Accordingly, the NC Final Letters threaten action not actually intended to be taken by [Defendant] in the ordinary course of business and constitute unfair threats, coercion, or attempts to coerce payments from consumers in violation of the FDCPA, NCDCA or NCCAA." (<u>Id.</u>, ¶ 69.) "Each NC Final Letter constitutes a separate violation of the FDCPA, the NCCAA or the NCDCA in that, *inter alia*, the NC Final Letter threatens to take action not taken in the ordinary course of business nor intended to be taken in the particular instance." (<u>Id.</u>, ¶ 73.) Put another way:

> Each NC Final Letter creates a false sense of urgency designed to unfairly coerce payments from consumers in that the letters indicate an intent to accelerate indebtedness if the arrearages are not cured by the deadline set forth in the NC Final Letters; however, pursuant to Defendant's actual corporate policy discussed *supra*, [Defendant] does not actually intend to follow through with its false ultimatum so long as consumers *partially* satisfy their arrearage.

(<u>Id.</u>, ¶ 74 (emphasis in original).) "As a result of the forgoing, Plaintiffs have experienced anxiety, stress, anger, frustration, and mental anguish which is fairly traceable to their receipt of NC Final Letters containing the false ultimatums which, *inter alia*, . . . misled Plaintiffs with regard to the amount of money that had to be paid and when it needed to be paid to save their homes from acceleration and/or foreclosure." (<u>Id.</u>, ¶ 76.)

**B. Defendant's Business Model**

Defendant did not originate and does not own the mortgages involved in this matter. (<u>See</u> Docket Entry 56-12 at 9 (100:23 to

100:24); Docket Entry 56-7 at 4 (13:16 to 13:20).) Instead, Defendant operates as a "servicer" for Fannie Mae, serving Fannie Mae "[a]lways" (Docket Entry 56-12 at 10 (101:2)) and "exclusively" (Docket Entry 51-1 at 17 (16:13)). (See, e.g., Docket Entry 56-12 at 9-10 (100:24 to 101:3); Docket Entry 51-1 at 17-18 (16:10 to 17:2).) As such, Defendant only obtains loans to service by "onboarding portfolios of loans that are Fannie Mae loans that have been previously serviced by a different financial institution." (Docket Entry 51-1 at 15 (14:7 to 14:9).) Fannie Mae determines which portfolios of loans Defendant services. (See id. at 23-24 (22:17 to 23:5).) Defendant receives as compensation for servicing these loans a fee from Fannie Mae as well as any late fees and certain other charges associated with the loans. (See id. at 32-33 (31:23 to 32:17); Docket Entry 51-5 at 2; see also Docket Entry 51-1 at 79-80 (78:20 to 79:10).)

### i. Onboarding Procedures

Defendant follows the same general procedure for onboarding loans. (See Docket Entry 51-1 at 22-23 (21:3 to 22:6).) Once Fannie Mae identifies a portfolio of loans to transfer to Defendant, Fannie Mae and Defendant enter into a subservicing agreement, a standardized agreement that lists the relevant loans on its associated schedules. (See id. at 26-28 (25:22 to 27:21).) Defendant then follows the same general onboarding transfer instructions. (See id. at 37 (36:3 to 36:18).)

10

These instructions include the issuance of a Defendant-approved "'Goodbye Letter'" from the previous servicer to each mortgagor, indicating that Defendant will commence servicing the relevant loan on a specific date (i.e., the transfer date). (See id. at 38-39 (37:9 to 38:6).) Defendant also requires the previous servicer to send Defendant certain information regarding the transferring loans at specific intervals before and after the effective date of their transfer. (See id. at 39-46 (38:7 to 45:17).) In particular, the previous servicer must provide Defendant with the personal identifier information, payment history, and loan status of each mortgage approximately 30 days before the effective date of transfer and must provide an updated, final version of such information by two business days after the transfer date. (Id.)[4] In addition, the previous servicer may provide updates regarding individual loans during the interim period between the preliminary and final information transfers, in which case the relevant loan file will reflect such communication. (See id. at 44-49 (43:15 to 48:7).)

**ii. Loan Procedures**

Once Defendant onboards a loan, it follows the same procedures for servicing that loan as it does for its existing loans. (See

_____

    4    Accordingly, one can determine which loans remained delinquent at the time of transfer by "look[ing] at these final data sets for every portfolio that was transferred" (id. at 57 (56:4 to 56:5)). (See id. (56:2 to 56:8).)

11

id. at 20-22 (19:1 to 21:2).) If a loan qualifies as less than 30 days past due, Defendant processes it in its "customer service delinquency management" department (Docket Entry 51-6 at 90 (89:9 to 89:10)), also known as "customer service" (id. (89:10)). (See also, e.g., Docket Entry 51-1 at 87 (86:10 to 86:19).)[5] If a loan becomes "more than 30 days in arrears" (Docket Entry 51-6 at 22 (21:14 to 21:15)), it moves into the "pre-foreclosure department" (id. at 23 (22:11)), where it remains until it reaches 121 days in arrearage (see id. at 22 (21:17 to 21:23)). (See also id. at 23 (22:13 to 22:18 (agreeing that "all activities during the period of 30 to 121 [days past due] takes [sic] place in the pre-foreclosure department")).) After 121 days, it moves into the foreclosure department. (See id. at 22-23 (21:20 to 22:7); see also Docket Entry 51-3 at 43 (42:15 to 42:22 (explaining that "'[Defendant] refers loan[s] to foreclosure between 120 and 126 days of delinquency'")).)

Defendant utilizes two avenues of communication in its attempts to collect overdue loans during the pre-foreclosure process: telephone conversations through its call center and written communication through its pre-foreclosure department. (See Docket Entry 51-6 at 24-25 (23:2 to 24:5), 91 (90:11 to 90:19).) "The pre-foreclosure department is responsible for sending all

---

5 Another of Defendant's employees referred to this department as "delinquency management or call center" (Docket Entry 51-3 at 87 (86:15 to 86:16)). (See id. (86:10 to 86:16).)

breach letters and all state and federal required notices prior to referring the loan to foreclosure" (id. at 24-25 (23:24 to 24:2)). (See id. at 25 (24:5).)  For North Carolina, a single document contains both the breach letter and the required notices. (Docket Entry 51-3 at 20 (19:1 to 19:5), 22-23 (21:21 to 22:5).)  This document (the "NC Final Letter" or "NOI") constitutes "the only letter that [the] pre-foreclosure [department] uses to attempt to collect money from [a] consumer during pre-foreclosure" (Docket Entry 51-6 at 24 (23:8 to 23:10)).  (See id. at 24-25 (23:2 to 24:17).)[6]  Aside from the specific borrower's information and amount due, the NC Final Letter "is substantially identical for all individuals who are due to receive it" (id. at 28 (27:20 to 27:22)).  (See id. (27:20 to 27:24).)  Defendant issues the NC Final Letter when a loan becomes between 45 and 60 days past due, "but usually closer to 45" (id. at 45 (44:12)).  (Id. (44:11 to 44:17).)  Defendant sends an NC Final Letter to every address on record for each obligor on the relevant loan.  (Id. at 34 (33:5 to 33:18).)

The NC Final Letter states the amount of the loan's delinquency and a deadline for paying that amount, called the "Expiration Date."  (See id. at 25 (24:21 to 24:24), 40-41 (39:14 to 40:7).)  The NC Final Letters in the record and the testimony of

---

6  Other names for the NC Final Letter include the North Carolina L724, DM724, and a 724.  (See Docket Entry 51-3 at 22-24 (21:21 to 23:6), 34 (33:7 to 33:12), 39 (38:22 to 38:24).)

Defendant's pre-foreclosure department employee who handled North Carolina loans reflect a fifty-day Expiration Date. (See, e.g., Docket Entries 39-1 to 39-12; Docket Entries 39-16 to 39-19; Docket Entry 51-3 at 34 (33:2 to 33:6); Docket Entry 51-4 at 2; Docket Entry 53-5 at 2, 10; Docket Entry 53-7 at 2, 5, 8, 11; Docket Entry 56-11 at 2, 6, 9, 18.) However, the record also contains testimony from Defendant characterizing the Expiration Date as "a 30-day period" (Docket Entry 51-6 at 25 (24:24); see id. (24:21 to 24:24 ("The L724 is to advertise [sic] the borrowers that they are delinquent and what their amount due is to bring current within that 35-day period -- actually 30 days. Sorry. It's a 30-day period."))).) The record further reflects that Defendant employs a state-dependent Expiration Date, which "[i]s typically 35 days" (Docket Entry 51-3 at 60 (59:18); see id. (59:16 to 59:19)); however, "in North Carolina, [Defendant] did not use the 35 day [E]xpiration [D]ate deadline," but rather "used 50 days" (id. at 75 (74:2 to 74:3); see id. (74:4)).

"The [E]xpiration [Date] on the letter is the date that [Defendant] would like the[ delinquent borrower] to get the money in." (Docket Entry 51-6 at 44 (43:24 to 43:25).) Further, for letters with a 30-day Expiration Date, full payment of the specified amount by the Expiration Date would enable removal of the loan from the pre-foreclosure department, as the account would become less than 30 days overdue even assuming failure to make an

14

intervening monthly payment. (See Docket Entry 51-3 at 87 (86:10 to 86:16).) However, failure to pay (any amount) by the Expiration Date "doesn't actually trigger anything" (id. at 78 (77:24)). (See, e.g., id. (77:14 to 77:25).) Rather, Defendant only refers a loan to the foreclosure department at or after 121 days past due. (See, e.g., id. at 20 (19:13 to 19:14), 44 (43:5 to 43:10); Docket Entry 51-6 at 22-23 (21:20 to 22:18); see also Docket Entry 51-3 at 76 (75:7 to 75:10 ("Q. And it's the 120 days delinquency that triggers a foreclosure referral, not the [E]xpiration [D]ate in the letter? A. That is correct.")).) Moreover, if an individual makes a payment — even a partial payment — after the Expiration Date, "[t]he whole process starts over" (Docket Entry 51-3 at 58 (57:18)) and Defendant sends a new NC Final Letter when the account becomes 45 days past due. (See id. at 51 (50:2 to 50:10), 58 (57:6 to 57:24).) In other words, in North Carolina, "when the customer makes a payment and they're still in arrears, a new NOI will be generated and sent to the customer" (id. at 51 (50:5 to 50:7)) "[a]s soon as the payment is applied" (id. (50:9)). (See id. (50:2 to 50:10); see also Docket Entry 51-6 at 39 (38:8 to 38:25).) In fact, in North Carolina, an individual could pay on the 122nd day to be automatically "kicked back" from the foreclosure referral and have "a new NOI . . . generated" (Docket Entry 51-3 at 66 (65:16)). (See id. (65:10 to 65:17).)

15

Unless the payment renders an account less than 30 days past due, it remains in the pre-foreclosure department. (See id. at 86-87 (85:25 to 86:21).) Moreover, although not authorized by Fannie Mae (see id. at 102 (101:4 to 101:7)), Defendant granted its employees discretion to reject payments that fail to bring a loan sufficiently current. (See id. at 81-85 (80:17 to 84:23), 100-06 (99:11 to 105:12).) More specifically, "[i]f the borrower was continuously making payments, [Defendant's employees] would be able to reject funds" (id. at 81 (80:24 to 80:25)). (See id. (80:17 to 80:25).)[7] The process of accepting or rejecting payments transferred from the pre-foreclosure department to another department in 2014. (Id. at 100 (99:11 to 99:14).) However, while it remained in the pre-foreclosure department, the employee responsible for North Carolina followed a policy of accepting payments that brought a loan "[l]ess than 60 days" delinquent (id. at 102 (101:24)). (See id. at 101-06 (100:13 to 105:12).)

If a loan reaches 121 days' delinquency, the pre-foreclosure department refers it to the foreclosure department unless it remains subject to certain "exceptions," such as bankruptcy or a military exemption, that prevent its referral. (See, e.g., id. at 24-28 (23:15 to 27:17), 77 (76:15 to 76:23), 89-91 (88:22 to 90:4).) Defendant accelerates the loan when it refers it to

---

7 The pre-foreclosure department identified borrowers subject to this policy with the code "X-Y" in their loan files. (See id. at 82-83 (81:12 to 82:12).)

16

foreclosure. (<u>See, e.g.,</u> Docket Entry 51-1 at 142-43 (142:21 to 142:1 ("The referral of the loan to attorneys to begin foreclosure is the step to accelerate the loan? . . . Yes.")); Docket Entry 51-6 at 30-34 (29:5 to 33:3).) When Defendant refers a loan to its foreclosure department, it sends all obligors on the account a form letter notifying them of the foreclosure referral. (<u>See</u> Docket Entry 51-1 at 134-39 (133:10 to 138:21).) This foreclosure notification letter states: "'[Defendant] ha[s] transferred [the person's] loan to [its] foreclosure department due to nonpayment and accelerated the maturity date of [the] loan'" (<u>id.</u> at 139 (138:5 to 138:7)). (<u>Id.</u> (138:5 to 138:10).) "'This means that the full amount of [the person's] loan balance is now due, and [Defendant] ha[s] referred [the] loan to [its] attorneys to begin foreclosure proceedings'" (<u>id.</u> at 141 (140:20 to 140:23)). (<u>See id.</u> (140:19 to 140:24).)

Defendant cannot refer a loan to foreclosure until it qualifies as at least 120 days delinquent. (Docket Entry 51-6 at 76-77 (75:6 to 76:2).)[8] Moreover, mere failure to pay late fees or other charges does not trigger foreclosure. (Docket Entry 51-1 at

---

8 Defendant's policy in this regard follows federal regulations. <u>See</u> 12 C.F.R. § 1024.41(f)(1)(i) ("A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless: (i) A borrower's mortgage loan obligation is more than 120 days delinquent[] . . . .").

17

87 (86:4 to 86:19).)[9]  In this regard, "the mortgage industry" differentiates between a "current" loan and one that "[i]s up to date," with a current loan signifying full payment of all monthly installments, namely, "the principal and interest and taxes and insurance payments that's owed," and an "up to date loan" signifying payment of "everything that's due and owing on the loan" (id. at 110 (109:9 to 109:14) (internal quotation marks omitted)), including any "late fees and additional fees owed on the loan" (id. at 109 (108:22 to 108:23)).  (See id. at 109-15 (108:14 to 114:11); see also id. at 99-102 (98:10 to 101:1).)

### iii. NC Final Letter

Despite the distinctions noted above, the form NC Final Letter that Defendant sends to delinquent borrowers treats all outstanding moneys as required to "bring [the borrower's] loan current" (Docket Entry 51-4 at 2).  (See id. at 2; see also id. at 4 (itemizing amount due, including $318.57 in "Late Fees").)  For instance, as reflected in Defendant's NC Final Letter to Koepplinger dated January 26, 2016, the letter states in relevant part:

> Your loan is in default due to non-payment of the amount below.
>
> Amount Due:        $2,687.26
> Amount Due By:     03/16/2016 ("Expiration Date")

---

9  Indeed, Defendant imposes no deadline for paying late fees, instead allowing "rolling" payments (id. at 100 (99:4)) or "mak[ing] those payments on a later day" (id. (99:22)).  (See id. at 99-103 (98:17 to 102:8).)

18

We hereby demand that you bring your loan current ("cure the default") by paying the amount shown above. In addition, your regular payment may become due by the Expiration Date. You also should be aware that the delinquent amount of principal continues to accrue interest.

If full payment of the default amount is not received by us in the form of a certified check, cashier's check, or money order on or before the Expiration Date, we will accelerate the maturity date of your loan and upon such acceleration the ENTIRE indebtedness of the loan, including principal, accrued interest, and all other sums due thereunder, shall, at once and without further notice, become immediately due and payable. Acceleration of the sums secured by the mortgage also may result in the sale of the premises. Any such action will not take place before 45 days from the date of this notice.

If you send only a partial payment, the loan still will be in default and we may keep the payment and still will accelerate the maturity date.

IF THE DEFAULT IS NOT CURED ON OR BEFORE THE EXPIRATION DATE, WE AND THE LOAN OWNER INTEND TO ENFORCE THE LOAN OWNER'S RIGHTS AND REMEDIES AND MAY PROCEED WITHOUT FURTHER NOTICE TO COMMENCE FORECLOSURE PROCEEDINGS. FORECLOSURE PROCEEDINGS WILL NOT BE COMMENCED UNLESS AND UNTIL ALLOWED BY APPLICABLE LAW. ADDITIONAL FEES SUCH AS FORECLOSURE COSTS AND LEGAL FEES MAY BE ADDED PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.

The loan is in default because you have failed to pay the required monthly installments commencing with the payment due 11/01/2015.

As of 01/01/2016, Total Monthly Payments (including principal, interest, and escrow if applicable), late fees, insufficient funds (NSF) fees, and other fees and advances due under the terms of your loan documents in the total amount of $2,687.26 are past due. This past-due amount is itemized below. If applicable, your account may have additional escrow amounts that have been paid out and are due on the loan.

| | |
|---|---|
| Total Monthly Payments: | $4,249.65 |
| Late Fees: | $318.57 |
| Insufficient Funds (NSF) Fees: | $0.00 |

19

```
Other Fees and Advances*:        $0.00
Advances*:                       $222.00

Amount Held in Suspense          $2,102.96
```

*Other Fees and Advances include those assessed in accordance with your loan documents, and/or permitted by applicable law, or that were authorized for services rendered. If you need additional information regarding any of these amounts, please contact us at the number provided below.

Nothing contained in this letter or in any other communication regarding the loan shall modify or waive any term or provision of the loan. The status of your loan may be reported to credit reporting agencies.

You have the right to reinstate your loan after acceleration and the right to bring a court action or assert in the foreclosure proceedings the nonexistence of a default or any other defense to acceleration and sale. If you reinstate your loan after acceleration, the loan no longer will be immediately due in full.

(Id. at 2-4 (emphasis in original).)[10]  The letter also contains on its first page a disclaimer stating:  "THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR.  WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. . . ."  (Id. at 2 (emphasis in original).)

Not accounting for duplication of copies sent to differing obligors and addresses, Defendant sent 66,218 NC Final Letters during the relevant time period.  (See Docket Entry 53-8 at 56-59

_____

    10  A borrower can reinstate a loan by paying all overdue amounts and fees, as well as attorney's fees and other expenses associated with the foreclosure proceedings.  (See Docket Entry 66-8 at 2-13 (Smith reinstatement letters); see also Docket Entry 51-8 at 49-50 (48:8 to 49:22 (discussing Smith's understanding of reinstatement, which "does not entail paying the full principal balance on the loan" (id. at 50 (49:1 to 49:2)))).)

(55:15 to 58:3).) Defendant can run a query in its electronic data storage system to determine the total number of NC Final Letters sent during the relevant time period. (See id. at 59-60 (58:4 to 59:23); see also id. at 77 (76:2 to 76:7).)[11] Based on a query run in preparation for one of its 30(b)(6) depositions, Defendant estimates that the number of such letters lies between 100,000 and 150,000. (See id. at 73-75 (72:24 to 74:17).) Defendant possesses the names and addresses of all the recipients of those letters, as well as any emails or Social Security Numbers such individuals provided in connection with servicing their loans. (See id. at 8-12 (7:18 to 11:5).) Defendant also identified the dates on which it sent each of the NC Final Letters. (Id. at 33 (32:14 to 32:22).) Further, by running a query of its data system, Defendant can determine which borrowers remained delinquent in monthly payments, fees, or other expenses at the time Defendant onboarded their loans. (See id. at 68-70 (67:12 to 69:15).)[12] Finally, through another query, Defendant can identify borrowers whose payments it rejected, at least insofar as Defendant wrote to the borrower regarding the rejected payment. (See id. at 14-15 (13:23 to 14:1), 78 (77:1 to 77:5), 79-80 (78:10 to 79:25), 82 (81:5 to

---

11 This task would take an hour or two. (See id. at 75-76 (74:20 to 75:9).)

12 Although not specific to the time of acquisition, Defendant testified that 9,300 North Carolina loans qualified as defaulted during the relevant period. (See Docket Entry 51-1 at 62-64 (61:21 to 63:12).)

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 21 of 94

81:22); see also Docket Entry 51-3 at 104 (103:15 to 103:19 (testifying to belief, by employee previously involved in process, that Defendant sends letter when it rejects payment)).)

### C. Koepplinger

Defendant obtained Koepplinger's loan from CitiMortgage effective February 1, 2014. (See Docket Entry 51-7 at 92 (91:4 to 91:8).) Pursuant to Defendant's onboarding protocols, CitiMortgage provided its preliminary data set for Koepplinger's loan (and other loans in the relevant portfolio) by January 6, 2014. (See Docket Entry 51-1 at 39-40 (38:7 to 39:5).) As of December 17, 2013, Koepplinger owed CitiMortgage two outstanding monthly payments, plus certain fees, with a third monthly payment due on January 1, 2014. (See Docket Entry 51-7 at 79-81 (78:12 to 80:13).) On December 21, 2013, Koepplinger paid CitiMortgage slightly more than one monthly payment. (See id. at 82-84 (81:4 to 83:24).) Accordingly, the preliminary data set CitiMortgage sent to Defendant would have reflected that Koepplinger remained behind on his payments. (See Docket Entry 51-1 at 49 (48:20 to 48:24), 76 (75:3 to 75:6).)[13]

On January 21, 2014, Koepplinger again paid CitiMortgage slightly more than one monthly payment. (See Docket Entry 51-7 at

---

13   CitiMortgage would have provided updated information to Defendant by February 4, 2014, but Koepplinger's loan file reflects no communications between CitiMortgage and Defendant in the interval between the preliminary and final data transfers. (See id. at 49 (48:4 to 48:19).)

85-87 (84:2 to 87:17).) Four days later, Koepplinger also paid CitiMortgage slightly more than one monthly payment. (See id. at 89 (88:2 to 88:13).) However, Koepplinger still owed certain late fees and charges totaling approximately $162. (See id. at 92-93 (91:16 to 92:14); Docket Entry 51-1 at 77-80 (76:1 to 79:3).) Defendant attempted to collect that outstanding $162.56 for months, and ultimately did collect it. (See Docket Entry 51-1 at 80 (79:4 to 79:10), 83-84 (82:23 to 83:1).)

In addition, Koepplinger failed to make his monthly payment due on February 1, 2014. (See Docket Entry 51-7 at 96-97 (95:12 to 96:10).)[14] Accordingly, Defendant's first statement, dated February 18, 2014, to Koepplinger after assuming servicing of his loan reflects that Koepplinger owed Defendant a total of $2,848.24, consisting of $1,342.84 for his overdue February payment, $1,342.84 for his payment due March 1, 2014, and $162.56 in delinquency charges and late fees. (See Docket Entry 51-1 at 80-84 (79:18 to 83:4).) Shortly thereafter, on February 26, 2014, Defendant sent Koepplinger a letter stating: "Dear Koepplinger, Kenneth, we are concerned that we have not received your mortgage payment of $1,505.40, which was due on February 1st, 2014" (id. at 88 (87:13 to 87:16)). (See id. (87:9 to 87:18).) This letter mistakenly

_____

14   The Note for Koepplinger's mortgage specifies that he "will be in default" if he fails to pay his monthly payment on the first day of each month. (Docket Entry 51-9 at 2.) Koepplinger failed to make his monthly payments from February 2014 to June 2014. (See Docket Entry 51-7 at 97-101 (96:19 to 100:24).)

treated the outstanding $162.56 as part of Koepplinger's overdue mortgage payment. (See id. at 88-89 (87:19 to 88:11).) On March 16, 2014, Defendant sent Koepplinger its first NC Final Letter, which specified that to "bring [his] loan current" (id. at 91 (90:17 to 90:18) (internal quotation marks omitted)) Koepplinger needed to pay "$2848.24" by May 5, 2014, which amount included the outstanding $162.54 in late fees. (Id. at 89-93 (88:17 to 92:5).)

In June 2014, Koepplinger paid all overdue amounts, including the $162.56, to Defendant. (See Docket Entry 51-7 at 96-101 (95:13 to 100:24).) However, in subsequent years Koepplinger again fell behind on his monthly payments, prompting Defendant to send him more NC Final Letters. (See Docket Entries 39-3 to 39-12; see also Docket Entry 53-6 at 12 (identifying 24 dates from March 16, 2014, to October 18, 2017, on which Defendant sent Koepplinger NC Final Letters).) Each time, Defendant sent Koepplinger an NC Final Letter at both his home address and his P.O. Box. (See, e.g., Docket Entries 39-1 to 39-12.) Koepplinger read both letters every time, a task that took a few minutes. (See Docket Entry 51-7 at 103-06 (102:22 to 105:22).) When Koepplinger fell behind in his payments, Defendant frequently telephoned him regarding his overdue account, in addition to sending him the NC Final Letters. (See, e.g., id. at 19 (18:3 to 18:13).) Koepplinger described these calls as harassing (see id.) and indicative of Defendant's belligerent attitude, explaining that he often received multiple

24

calls in one day, beginning at 6 a.m. and continuing until 8 p.m., during which calls, Defendant's employees screamed at him and alternated between purporting to work with Koepplinger, such as by waiving a late fee, and disavowing arrangements made in previous telephone conversations. (See, e.g., id. at 19-21 (18:3 to 20:8), 39-40 (38:5 to 39:9), 43 (42:3 to 43:7), 126-27 (125:21 to 126:25), 130 (129:3 to 129:9), 136 (135:3 to 135:8), 143-45 (142:18 to 144:6).)[15] In part because of this "good cop/bad cop" (id. at 39 (38:21 to 38:22)) approach, Koepplinger felt that he could not trust Defendant and he worried that Defendant would foreclose on his house when he failed to make the required payments. (See, e.g., id. at 124-26 (123:25 to 125:4).)

On December 1, 2015, Defendant sent Koepplinger another NC Final Letter, which demanded payment of $4,266.15 by January 20, 2016. (See Docket Entry 39-3 at 2.) On December 21, 2015, likely in response to a telephone call with Defendant, Koepplinger paid $1,600 towards that outstanding amount. (Docket Entry 51-7 at 118-20 (117:6 to 119:12).) On December 22, 2015, Defendant sent Koepplinger another NC Final Letter, reflecting an amount due of $2,718.43, with an Expiration Date of February 10, 2016. (Id. at

---

15 Koepplinger further testified that although he found these telephone conversations stressful, the NC Final Letters remained independently stressful because of their threats of acceleration and foreclosure. (See, e.g., id. at 135-36 (134:23 to 135:2 ("The default letters, seeing that in black and white; they're going to take your house, they're going to take your house. No matter what you do, they're going other take your house. That causes [stress].")).)

120-21 (119:18 to 120:2).)  On January 26, 2016, Koepplinger paid Defendant another $1,500, again likely in response to a telephone call suggesting that he pay a specific amount by a specific date. (See id. at 120-22 (119:18 to 121:22).)  That same day, Defendant sent Koepplinger another NC Final Letter, with an Expiration Date of March 16, 2016, demanding payment of $2,687.26.  (Id. at 123 (122:4 to 122:19).)  On February 29, 2016, Koepplinger paid $1,451.20 towards this outstanding amount.  (See id. at 124 (123:1 to 123:16).)

Given his failure to make full payments by the Expiration Dates in the NC Final Letters, Koepplinger remained fearful that Defendant would foreclose on his house.  (See, e.g., id. at 124-29 (123:20 to 128:16).)  Indeed, based on the representation in the NC Final Letter that "'[a]ny such action will not take place before 45 days from the date of this notice'" (id. at 109 (108:12 to 108:13)), Koepplinger believed that Defendant would accelerate his loan and foreclose on his home within 45 days of an NC Final Letter if he failed to pay the full amount due.  (See id. (108:7 to 108:19).)[16]  Accordingly, he worried about returning home to find a padlock on his gate indicating that Defendant had foreclosed. (See id. at 20-22 (19:15 to 21:2); see also id. at 125-29 (124:6 to

_____

16  Although he declined to opine on the legal meaning of acceleration, Koepplinger explained that he believed it meant to speed things up and he perceived it as part of the foreclosure, explaining that he "look[s] at the whole thing as foreclosure" (id. at 140 (139:5)).  (See, e.g., id. at 36-37 (35:8 to 36:11), 140 (139:3 to 139:5).)

128:16 (elaborating upon the reasons that "[he] was living with wondering if there was going to be a padlock on [his] fence when [he] got home")).) Koepplinger explained that he wondered if "it [was] just [that Defendant] d[id]n't want [his] house yet" because Defendant "can grab it at any time," and that he "was really bothered by it." (Id. at 125 (124:12 to 124:14); see also id. at 127-28 (126:8 to 127:8 (explaining that "it was just way too much" and that he took the repeated letters regarding foreclosure "as a threat")).)[17] The NC Final Letters made him feel depressed, upset, and "miserable" (id. at 135 (134:15)), and also caused him "undue stress" (id. (134:17)). (See id. at 135-41 (134:7 to 140:20).)[18]

---

17  In this regard, Koepplinger explained that he had

watched developers . . . threaten their clients to take
back, take back, take back, and they only took back when
they found someone else to sell it to.

       Until then, they left let [sic] the lovely people
pay whatever they could pay and keep -- and just keep
them strung on to pay some of those bills until they
found a buyer.

(Id. at 128-29 (127:25 to 128:8).)  As such, he believed that
"[w]hen it got to be [to Defendant's] advantage that [it] could
sell [his] property, [Defendant] would do it." (Id. at 140 (139:17
to 139:18).)

18  For instance, Koepplinger explained that

Well, looking at a piece of paper that says, "We're going
to foreclose on your house," and seeing that every month,
if I was a lawyer, I'd could [sic] shake it off; "Nah,
they're wasting paper."  But I'm not.  I took it as
they're going to lock me out of my house.  That's the way

In response to these NC Final Letters, Koepplinger sold firearms and delayed payment on other accounts, resulting in higher interest payments, to pay Defendant. (See id. at 56-57 (55:8 to 56:17), 131-33 (130:8 to 132:6), 134-35 (133:19 to 134:10).) In addition, he and his fiancé began discussing selling his house — a historic home that he owned for approximately 30 years and spent two and a half years restoring — "to get the heck away from [Defendant]" because "[Defendant] just made [Koepplinger] miserable" (id. at 135 (134:14 to 134:15)) and he "just wanted it to go away" (id. at 125 (124:15 to 124:16)) "because life was very hard with [Defendant]" (id. (124:20 to 124:21)). (See id. at 29 (28:1 to 28:4), 53-54 (52:6 to 53:12), 125 (124:12 to 124:22), 135-36 (134:10 to 135:2).) Accordingly, approximately a year and a half ago, Koepplinger sold this home, paying off his mortgage and receiving money back from Defendant. (See id. at 12 (11:4 to 11:22), 44 (43:22 to 43:23), 131 (130:1 to 130:7).)

**D. Smith**

Separately, Defendant obtained Smith's mortgage for servicing from Chase Bank on September 1, 2014. (Docket Entry 51-1 at 121-27 (120:22 to 126:9).) At that time, Smith remained two mortgage payments in arrears, having failed to pay in July and August 2014.

---

I took it. I took it hard every time. Got over it, but took it hard.

(Id. at 138 (137:16 to 137:22).)

(See id. at 127-29 (126:13 to 128:10).)  Thus, on September 15, 2014, Defendant sent Smith an NC Final Letter, specifying an amount due of $1,968.02 and an Expiration Date of November 4, 2014.  (Id. at 125-29 (124:12 to 128:3); see also Docket Entry 39-16 at 2.) Smith did not make this payment or any of her mortgage payments for several months after Defendant began servicing her loan. (See Docket Entry 51-8 at 56 (55:2 to 55:8); see also Docket Entry 51-1 at 130-34 (129:21 to 133:13 (discussing referral of Smith's mortgage to foreclosure on December 4, 2014)).)  On December 4, 2014, Defendant transferred Smith's loan from its pre-foreclosure to its foreclosure department.  (See Docket Entry 51-1 at 134 (133:10 to 133:13).)  A few days later, Defendant sent Smith a letter notifying her of the foreclosure referral, which stated: "We have transferred your loan to our foreclosure department due to nonpayment and accelerated the maturity date of your loan" (id. at 139 (138:5 to 138:7) (internal quotation marks omitted)).  (See id. at 135-41 (134:10 to 140:8).)

For reasons that remain unclear, a court dismissed Defendant's foreclosure proceedings against Smith in or after December 2015. (See Docket Entry 51-8 at 25-27 (24:12 to 26:2).)  It appears that Smith received funding through HUD to reinstate her mortgage in connection with that foreclosure proceeding.  (See id. at 126-27 (125:25 to 126:7).)  However, Smith fell behind in her mortgage payments again in 2017 and 2018, prompting Defendant to send her

29

additional NC Final Letters.  (See Docket Entries 39-17 to 39-19.)
More specifically, Defendant sent Smith an NC Final Letter on
August 15, 2017, which demanded $1,515.96 by October 4, 2017.
(See Docket Entry 39-17 at 2; Docket Entry 51-8 at 136 (135:6 to
135:9).)  Smith borrowed money from her mother to pay the requested
amount, paying it in full on or before September 1, 2017.
(See Docket Entry 51-8 at 136-37 (135:10 to 136:3); see also id. at
147 (146:19 to 146:21 (explaining that Smith's mother "offered to
pay the amounts due in the letter in -- in 2017")).)[19]

Defendant also sent Smith an NC Final Letter on May 15, 2018,
which contained an Expiration Date of July 4, 2018.  (See Docket
Entry 39-18 at 2.)  In response to this letter, Smith recalls
making payments in "May and June" (Docket Entry 51-8 at 141
(140:19)), but Defendant's loan history for Smith reflects three
payments on August 27, 2018 (see id. at 138-43 (137:23 to 142:12)).
On September 4, 2018, Defendant sent Smith another NC Final Letter,
specifying that she failed to pay her monthly payments commencing
with the payment due July 1, 2018.  (Docket Entry 39-19 at 2-3.)
This NC Final Letter reflects an Expiration Date of October 24,
2018, and an amount due of $2,259.37.  (Id. at 2; see also Docket
Entry 51-8 at 146 (145:5 to 145:11).)  In or before February 2019,
Smith "made a large payment" (Docket Entry 51-8 at 146 (145:12);

_____

    19  Smith continued to borrow money from her mother to pay her
mortgage loan until approximately the end of 2017.  (See id. at
154-56 (153:10 to 155:24).)

<u>see</u> <u>id.</u> (145:12 to 145:25)) that brought her account current. (<u>See</u> <u>id.</u> at 85-97 (84:9 to 96:19).)[20]  In early 2019, Smith sold some assets, including a race truck and, likely, a sword collection belonging to her deceased ex-husband, to make these payments. (<u>Id.</u> at 98-102 (97:7 to 101:14).)

Around this same time, Defendant again instituted foreclosure proceedings against Smith. (<u>See</u> <u>id.</u> at 87-92 (86:13 to 91:24).) Smith did not learn of these foreclosure proceedings until after she made the payments that brought her account current. (<u>See</u> <u>id.</u>; <u>accord</u> <u>id.</u> at 109 (108:1 to 108:22).)  Given her current status, Defendant stopped the foreclosure proceedings. (<u>See</u> <u>id.</u> at 84-85 (83:21 to 84:18); <u>accord</u> <u>id.</u> at 97 (96:10 to 96:13), 125-26 (124:1 to 125:24).)

Smith generally received two copies of the NC Final Letters, one addressed to her physical address and one to her P.O. Box. (<u>See</u> <u>id.</u> at 72-73 (71:25 to 72:6).)  Smith read the letters every time she received them. (<u>Id.</u> at 73 (72:7 to 72:22), 75-76 (74:21 to 75:12).)  Smith testified that the NC Final Letters caused her anxiety and stress. (<u>See, e.g.,</u> <u>id.</u> at 162-63 (161:25 to 162:5 (confirming that, in response to NC Final Letters, Smith "felt depressed, anxious, worried, had difficulty sleeping, had shaking episodes")).)  In this regard, Smith testified that her long

---

20  This payment included Defendant's reimbursement of $1,398, an amount double Smith's normal monthly payment, for property taxes that Defendant erroneously collected on Smith's loan. (<u>Id.</u> at 95 (94:6 to 94:25).)

duration of unemployment (spanning from 2010 to 2019 (see id. at 54-56 (53:2 to 55:20))) and consequent lack of funds caused her stress (see id. at 58-59 (57:19 to 58:6)), but that the NC Final Letters caused her greater stress and depression because she "was worried about [Defendant] foreclosing on -- on -- on [her] home" (id. at 165 (164:19 to 164:20)). (See, e.g., id. at 61-62 (60:25 to 61:5); see also id. 163 (162:21 to 162:25 (explaining that the "letters was [sic] a bigger impact where you're -- you're in fear of [Defendant] taking your home because you're supposed to pay a certain amount of money by a certain -- certain date or [Defendant wi]ll foreclose on your home")).)

Smith testified that, had she known either that she "had more time to pay the[] amounts of money" specified in the NC Final Letters (id. at 113 (112:15 to 112:16)) or that she "could've paid smaller amounts" (id. at 158 (157:5)), she would have acted differently. (See, e.g., id. (157:4 to 157:9).) For instance, Smith often relied on a friend to pay her utility expenses during the relevant period, but had she known about Defendant's actual policies, she would have paid Defendant smaller amounts and contributed more towards her own utility bills rather than relying on her friend. (See id.; see also id. at 162 (161:14 to 161:18 (confirming that Smith "wouldn't have borrowed money from [her friend] if [she] could've used [her] own money to pay the utility bills")).) In addition, she would have been able to promptly pay

an attorney she hired in 2017 to handle a servicing dispute with Defendant "rather than have to make him wait later" (id. at 160 (159:2 to 159:3)). (See id. at 159-60 (158:22 to 159:3); see also id. at 22 (21:16 to 21:23).) Finally, she would have altered her response to the 2017 NC Final Letter by paying a smaller amount while she worked to resolve an ongoing servicing issue with Defendant, wherein Defendant increased her monthly payment in a mistaken attempt to collect taxes (and possibly insurance) on property that Smith owned outright, which adjoined the property subject to her Fannie Mae mortgage (see id. at 22-23 (21:16 to 22:20), 27-28 (26:10 to 27:8), 39-40 (38:18 to 39:13), 77-78 (76:13 to 77:7)). (See id. at 153 (152:2 to 152:23).) In particular, Smith testified, in regards to the NC Final Letter in August 2017,

> if I had've known that I had more time to pay that, I would've made a better decision and not have borrowed money from my mother and paid a little bit, got this straight on my servicing issues, and then paid the amount that I needed to get current.
>
> Q And why do you say you would've made a better decision? What would the better decision have been?
>
> A Because I would've known that I had more time to have paid that instead of having to pay the whole amount due.
>
> Q So you would not have paid, period, or you would have paid sometime later or what would you have done?
>
> A I would've made a smaller -- smaller payment.

(Id. (152:7 to 152:23).)[21]

---

21  Neither Smith's attorney nor her mother charged her interest on the money she owed/owes them. (See id. at 161 (160:16 to 160:17), 154 (153:3 to 153:5).)

33

## DISCUSSION

### I. Relevant Standards

Different standards apply to the Summary Judgment Motions and Certification Motion, as discussed below.

### A. Summary Judgment

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard,

34

the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Barber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

**B. Class Certification**

In addition to seeking partial summary judgment (see Docket Entry 50 at 1), Plaintiffs seek class certification "pursuant to Rules 23(a) and 23(b)(3)" (Docket Entry 52 at 1). Because a class action represents "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979), parties "seeking to maintain a class action 'must affirmatively demonstrate [their] compliance' with Rule 23." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)). As the Supreme Court has explained

> [Rule 23] "does not set forth a mere pleading standard." Rather, a party must not only "be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact," typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b). The provision at issue here is Rule 23(b)(3), which requires a court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members."
>
> Repeatedly, we have emphasized that it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.
>
> The same analytical principles govern Rule 23(b). If anything, Rule 23(b)(3)'s predominance criterion is

36

even more demanding than Rule 23(a). Rule 23(b)(3), as
an adventuresome innovation, is designed for situations
in which class-action treatment is not as clearly called
for. That explains Congress's addition of procedural
safeguards for (b)(3) class members beyond those provided
for (b)(1) or (b)(2) class members (*e.g.*, an opportunity
to opt out), and the court's duty to take a close look at
whether common questions predominate over individual
ones.

Comcast, 569 U.S. at 33-34 (citations and some quotation marks
omitted).

## II. Summary Judgment Motions

### A. Preliminary Matters

To begin, Plaintiffs "do[] not oppose dismissal of [their]
UDTPA claim[s]." (Docket Entry 65 at 29 (explaining that
"[d]iscovery has identified that [Defendant's] actions are covered
by either the NCCAA or NCDCA"); Docket Entry 66 at 27 (same).)
Moreover, because, as discussed below, Defendant does not qualify
as a collection agency under the NCCAA, Plaintiffs cannot maintain
a separate UDTPA claim. See N.C. Gen. Stat. § 75-56(a) ("The
specific and general provisions of th[e NCDCA] shall exclusively
constitute the unfair or deceptive acts or practices proscribed by
[North Carolina General Statute Section] 75-1.1 in the area of
commerce regulated by th[e NCDCA]."). Accordingly, the Court
should grant Defendant's request for summary judgment on
Plaintiffs' UDTPA claims. (See Docket Entry 54 at 2; Docket Entry
55 at 2; see also, e.g., Docket Entry 58 at 29 (asserting that
"Koepplinger's exclusive remedy is the NCDCA, and [Defendant] is

37

entitled to summary judgment on his []UDTPA claim"); accord Docket Entry 59 at 24.)

Next, the parties dispute the applicability of the NCCAA to Defendant. (Compare, e.g., Docket Entry 51 at 22-24 (arguing NCCAA applies to Defendant), with, e.g., Docket Entry 58 at 19-21 (arguing NCCAA does not apply to Defendant).) The NCCAA applies to any "[c]ollection agency," defined as "a person directly or indirectly engaged in soliciting, from more than one person[,] delinquent claims of any kind owed or due or asserted to be owed or due the solicited person and all persons directly or indirectly engaged in the asserting, enforcing or prosecuting of those claims," N.C. Gen. Stat. § 58-70-15(a) (internal quotation marks omitted). Plaintiffs maintain that Defendant fits this definition because it "collects debts owed to third-parties; in this case [Defendant] collects on behalf of the various trusts created by Fannie Mae which hold Fannie Mae mortgages and/or the investors in the mortgage backed securities market managed by Fannie Mae." (Docket Entry 51 at 22.) Defendant, however, maintains that it "is not a 'collection agency' subject to the NCCAA because it does not solicit claims from more than one entity. Rather, [Defendant] solicits delinquent claims from only one entity — [Fannie Mae]." (Docket Entry 58 at 22 (citations omitted).)

Defendant's argument possesses merit. The record reflects that Defendant solicits mortgages, which may or may not qualify as

38

delinquent, for service "[a]lways" (Docket Entry 51-3 at 102
(101:2)) and "exclusively" from Fannie Mae (Docket Entry 51-1 at 17
(16:13)).  The fact that, as Plaintiffs argue (see Docket Entry 51
at 22 n.5), Fannie Mae sells mortgage-backed securities to
investors either directly or through trusts that Fannie Mae
establishes, see Lightfoot v. Cendant Mortg. Corp., __ U.S. __, __,
137 S. Ct. 553, 557 (2017); Basics of Fannie Mae Single-Family MBS,
http://www.fanniemae.com/resources/file/mbs/pdf/basics-sf-mbs.pdf
(last visited Apr. 29, 2020), does not alter this conclusion.  Most
importantly, Plaintiffs have identified no evidence in the record
indicating that Defendant solicits mortgages or claims from these
trusts or investors as opposed to Fannie Mae.  (See Docket Entry 51
at 22 (citing only Docket Entry 51-1 at 14-15 (13:14 to 14:10));
see also Docket Entry 65 at 21-22 (same); Docket Entry 66 at 19-20
(same).)  To the contrary, the evidence that Plaintiffs cite in
support of their contention reflects that Defendant (1) "only
services loans for Fannie Mae" (2) "[s]ubject to a contract that
[Defendant] had with Fannie Mae."  (Docket Entry 51-1 at 14 (13:19
to 13:23) (emphasis added).)[22]

---

[22]  Additionally, it appears unlikely that any such trusts
would qualify as a "person" under the NCCAA.  See, e.g., Insurance
- Collection Agencies and Bail Bondsmen, 2001 North Carolina Laws
S.L. 2001-269 (H.B. 356) (replacing, in an act designed to "clarify
the definition of collection agency," references to "persons,
firms, corporations, and associations" and "person, firm,
corporation[,] or association" with "person" (all-cap font
omitted)).

Further, the fact that Defendant "collected debt (e.g., late fees) owed to Plaintiffs' prior servicers, CitiMortgage, Inc. and Chase Bank, N.A." (Docket Entry 51 at 22), does not in and of itself render it a covered collection agency. Again, Plaintiffs have identified no evidence in the record reflecting that Defendant solicited those debts _from_ CitiMortgage and Chase Bank, as the NCCAA requires, _see_ N.C. Gen. Stat. § 58-70-15(a). (_See_ Docket Entry 51 at 22; _see also_ Docket Entry 65 at 21-22; Docket Entry 66 at 19-20.) As such, the fact that Defendant collected — and apparently retained (_see_ Docket Entry 51 at 4 (asserting, as an undisputed fact in support of Plaintiffs' Motion, that Defendant's "compensation includes late charges and fees assessed to borrowers, including unpaid fees owed to prior servicers")) — fees that remained outstanding at the time Defendant acquired servicing rights to a loan from Fannie Mae does not transform it into a collection agency under the NCCAA.

In sum, the record establishes that, rather than "engag[ing] in soliciting, from _more than one_ person," Defendant solicited from _only "one_ person[, namely, Fannie Mae,] delinquent claims" allegedly "due the solicited person," N.C. Gen. Stat. § 58-70-15(a) (emphasis added). Accordingly, Defendant does not qualify as a collection agency under the NCCAA, _see_ _id._[23] The Court should

_____

23 As such, the Court need not resolve whether amendments to the list of entities exempted from the ambit of the NCCAA collection agency definition under North Carolina General Statute Section 58-70-15(c) in 2017 qualify as clarifying, as Defendant

40

therefore grant Defendant's request for summary judgment on Plaintiffs' NCCAA claims.

Finally, Defendant maintains that the FDCPA does not apply to Koepplinger's claim, on the theory that "Koepplinger's loan was current when [Defendant] acquired servicing rights." (Docket Entry 58 at 7.) More specifically, Defendant contends that "Koepplinger's FDCPA claim fails as a matter of law because Koepplinger was not in default when [Defendant] began servicing his loan, exempting [Defendant] from 'debt collector' status under the FDCPA." (Id. at 8.) Plaintiffs dispute this contention. (See, e.g., Docket Entry 65 at 6-8.) In this regard, though, Plaintiffs' arguments fall short.

The FDCPA governs the conduct of "debt collectors." See 15 U.S.C. § 1692e; 15 U.S.C. § 1692g; see also Church v. Accretive Health, Inc., No. CV 14-0057, 2015 WL 7572338, at *8 (S.D. Ala. Nov. 24, 2015) ("On their face, both § 1692e and § 1692g regulate only the conduct of 'debt collectors.'"), aff'd, 654 F. App'x 990 (11th Cir. 2016). The term "'debt collector' is a term of art in the FDCPA." Ausar-El ex rel. Small, Jr. v. BAC (Bank of Am.) Home Loans Servicing LP, 448 F. App'x 1, 2 (11th Cir. 2011). As relevant here, the FDCPA expressly excludes from its definition of "debt collector" any person attempting to collect "a debt which was

contends (see, e.g., Docket Entry 68 at 17-19), or altering, as Plaintiffs maintain (see, e.g., Docket Entry 73 at 7-10).

41

not in default at the time it was obtained by such person." 15

U.S.C. § 1692a(6)(F)(iii).[24]  However:

> [T]he term "default" is not defined in the FDCPA, leaving courts to apply the statute without congressional guidance as to the meaning of this pivotal term.  In practice, where a contract between the originating creditor and the consumer delineates when the account will be deemed defaulted, or where some other applicable statute or regulation fixes the precise moment of default, courts have generally held that such agreements or legal provisions dictate when an account is "in default" for FDCPA purposes.

Church, 2015 WL 7572338, at *8; see also id. at *9 (explaining that

"a helpful body of precedent" exists for situations lacking such

guidance as to the precise moment of default, wherein, inter alia,

"courts have repeatedly distinguished between a debt that is in

---

24  Courts have explained the rationale underlying the "not in default" exception as follows:

> "If the loan is current when it is acquired, the relationship between the assignee and the debtor is, for purposes of regulating communications and collections practices, effectively the same as that between originator and the debtor.  If the loan is in default, no ongoing relationship is likely and the only activity will be collection."  F.T.C. v. Check Investors, Inc., 502 F.3d 159, 174 (3rd Cir. 2007) (quoting Schlosser v. Fairbanks Capital Corp., 323 F.3d 534, 538 (7th Cir. 2003)); see also Ruth [v. Triumph P'ships], 577 F.3d [790,] 797 [(7th Cir. 2009)] ("The purchaser of an already-defaulted debt — like the debt collector, and unlike the originator and servicer of a non-defaulted debt — has no ongoing relationship with the debtor and, therefore, no incentive to engender good will by treating the debtor with honesty and respect.").

Church, 2015 WL 7572338, at *9.

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 42 of 94

default and a debt that is merely outstanding" (internal quotation marks omitted)).

Defendant contends that such logic applies here. (<u>See</u> Docket Entry 58 at 8-9.) In particular, Defendant asserts that, because Koepplinger's Note specifies that a default occurs if Koepplinger fails to timely pay his monthly payment, consisting of his principal and interest, and separately discusses late charges, Koepplinger "was not in default under the terms of his Note when [Defendant] acquired servicing rights on February 1, 2014" (<u>id.</u> at 8). (<u>See</u> <u>id.</u> at 8-9; <u>see also</u> Docket Entry 51-9 at 2-3 (Koepplinger's Note).) "Yet," according to Plaintiffs, "that is not how [Defendant] *treated* Koepplinger's loan at the time it was transferred to [Defendant]." (Docket Entry 65 at 7 (emphasis in original) (citing <u>Bridge v. Ocwen Fed. Bank, FSB</u>, 681 F.3d 355, 360 n.4 (6th Cir. 2012); <u>see also</u> <u>id.</u> at 8 ("Simply put, Koepplinger's loan was delinquent at the time of transfer and treated as in default by [Defendant].").)[25] And, Plaintiffs assert, "'[a] loan

_____

    25  In this regard, Plaintiffs emphasize that (1) Koepplinger remained delinquent on his late fees at the time of transfer, (2) Koepplinger remained several mortgage payments in arrears when CitiMortgage sent its preliminary data set to Defendant and nothing in Koepplinger's loan file reflects that CitiMortgage notified Defendant of Koepplinger's subsequent mortgage payments before the final data set transfer deadline after Defendant acquired Koepplinger's loan, (3) Defendant characterized the outstanding late fees as part of his overdue monthly payment in a letter to Koepplinger, and (4) Defendant's NC Final Letters include late fees and other charges in the amount they identify as necessary to "cure the default" (<u>id.</u> at 7 (emphasis omitted)). (<u>Id.</u> at 6-8.)

43

servicer will become a debt collector under 1692a(6)(F)(iii) if the debt was in default or *treated as such* when it was acquired.'" (Id. at 6 (emphasis in original) (quoting Yarney v. Ocwen Loan Servicing, LLC, 929 F. Supp. 2d 569, 575 (W.D. Va. 2013)).)[26]

The line of cases upon which Plaintiffs rely for this assertion apply awkwardly here, as they involve situations where the defendant mistakenly treated a current or closed account as defaulted. See, e.g., Bridge, 681 F.3d at 357 (involving erroneously dishonored mortgage payment checks); Yarney, 929 F. Supp. 2d at 572 (involving Wells Fargo servicer who continued to demand payment of mortgage where the "[p]laintiff no longer owned the deed or owed any debt to Wells Fargo"). However, even applying this approach, Koepplinger's account did not qualify as defaulted when Defendant obtained it. For instance, rather than immediately sending an NC Final Letter regarding the outstanding late fees, Defendant first sent a letter to Koepplinger regarding his outstanding February mortgage payment. (See Docket Entry 51-1 at 88 (87:9 to 87:18).)

Although this letter mistakenly includes the late fees in the amount of the outstanding mortgage payment, it adopts a conciliatory tone more indicative of an entity envisioning an

_____

26 Defendant disputes this understanding of the FDCPA. (See Docket Entry 74 at 8 (contending that FDCPA imposes "a bright-line rule, rather than an amorphous, subjective test based on how a particular defendant 'treated' a loan").)

ongoing relationship rather than strictly collection activity. (See id. (87:13 to 87:16 ("Dear Koepplinger, Kenneth, we are concerned that we have not received your mortgage payment of $1,505.40, which was due on February 1st, 2014.")).) Further, Defendant waited until March 16, 2014, the 45th day after Koepplinger missed his February mortgage payment, to send his first NC Final Letter. (See Docket Entry 39-1; Docket Entry 53-6 at 12.) By contrast, Defendant sent an NC Final Letter to Smith a mere fortnight after acquiring her (unquestionably defaulted) loan for servicing. (See Docket Entry 39-16.) Accordingly, the record does not support a finding that Defendant treated Koepplinger's loan as defaulted at the time of acquisition.

The same conclusion arises if one focuses solely on the outstanding late charges. Koepplinger's Note does not specify a deadline by which he had to pay outstanding late charges. (See Docket Entry 51-9 at 2 (specifying only that borrower "will pay [a] late charge promptly").) Notwithstanding the language in the NC Final Letters, Defendant also imposes no deadline by which one must pay a late fee. (See Docket Entry 51-1 at 99-103 (98:8 to 102:8).) The record thus does not support a finding that Koepplinger's late fees, although admittedly outstanding, qualified as "in default" when Defendant obtained his loan. See Church, 2015 WL 7572338, at *9 (discussing distinction between outstanding and defaulted debts).

45

In short, Koepplinger's loan did not qualify as "in default" when Defendant obtained it.  Defendant therefore does not qualify as a "debt collector" under the FDCPA as to Koepplinger.  <u>See</u> 15 U.S.C. § 1692a(6)(F)(iii).  As a result, the Court should grant Defendant's request for summary judgment on Koepplinger's FDCPA claim.

## B.  Smith's FDCPA Claim

By contrast, Defendant qualifies as a debt collector under the FDCPA in connection with Smith's loan.  (<u>See</u> Docket Entry 51-1 at 127-29 (126:6 to 128:10).)[27]  Defendant contends, however, that "the evidence fails to support [her FDCPA] claim" (Docket Entry 59 at 6), on the theory that the NC Final Letters contain no material

---

27  In addition, Smith satisfies the first element of an FDCPA claim, namely that she "'has been the object of collection activity arising from consumer debt,'" <u>Boosahda v. Providence Dane LLC</u>, 462 F. App'x 331, 333 n.3 (4th Cir. 2012) (explaining that an FDCPA claim requires that "'(1) the plaintiff has been the object of collection activity arising from consumer debt; (2) the defendant is a debt collector as defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA'").  <u>See</u> 15 U.S.C. § 1692a(3) (defining consumer as "any natural person obligated or allegedly obligated to pay any debt"); 15 U.S.C. § 1692a(5) (defining debt as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes"); <u>see also</u> <u>Newman v. Boehm, Pearlstein & Bright, Ltd.</u>, 119 F.3d 477, 481 (7th Cir. 1997) (observing that, where transactions involved "the purchase of the family homes, . . . there can be little doubt that the subject of those transactions had a personal, family, or household purpose" as required to qualify as a debt under the FDCPA).

46

misrepresentations (see id. at 6-15).  As discussed below, this contention lacks merit.

"The FDCPA protects consumers from abusive and deceptive practices by debt collectors, and protects non-abusive debt collectors from competitive disadvantage."  United States v. National Fin. Servs., Inc., 98 F.3d 131, 135 (4th Cir. 1996).  To this end, "Section 1692e forbids the use of 'any false, deceptive, or misleading representation or means' in debt collection," id., including:

> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
>
> * * * * * *
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

Id. (internal quotation marks omitted) (alteration in original).[28]

"Whether a communication is false, misleading, or deceptive in violation of [Section] 1692e is determined from the vantage of the 'least sophisticated consumer.'"  Powell v. Palisades Acquisition

_____

    28  Although the Second Amended Complaint omits the language of Section 1692e(5) from its paragraph specifying the "pertinent part" of the FDCPA (Docket Entry 39, ¶ 115), it alleges, inter alia, that "[Defendant] has attempted to collect debt in violation of 15 U.S.C. § 1692e, in that it . . . threatened action it did not intend to take; and threatened to take action that it could not legally take" (id., ¶ 116) and "[Defendant] has attempted to collect debt in violation of 15 U.S.C. § 1692e, in that it has threatened to take action, including acceleration and foreclosure, when it had no intention of taking such measures" (id., ¶ 120).  Accordingly, contrary to Defendant's contention (see Docket Entry 75 at 9 n.3), the Second Amended Complaint fairly raises a claim for violation of Section 1692e(5).

47

<u>XVI, LLC</u>, 782 F.3d 119, 126 (4th Cir. 2014) (some internal quotation marks omitted). "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." <u>National Fin.</u>, 98 F.3d at 136 (internal quotation marks omitted).[29] In analyzing an alleged misstatement from this perspective, the Court "consider[s] how a naive consumer would interpret the statement." <u>Elyazidi v. SunTrust Bank</u>, 780 F.3d 227, 234 (4th Cir. 2015) (internal quotation marks omitted).

To sustain a Section 1692e claim, a misstatement must qualify as "material," which means that it must either possess the potential to "frustrate [the least sophisticated] consumer's ability to intelligently choose his or her response," <u>Powell</u>, 782 F.3d at 126 (internal quotation marks omitted), or constitute the kind of misstatement that "would have been *important* to the consumer *in deciding how to respond* to efforts to collect the debt," <u>id.</u> at 127 (emphasis in original). Finally, "evidence of actual deception is unnecessary[;]" rather, "the test is the capacity of the statement to mislead." <u>National Fin.</u>, 98 F.3d at 139 (discussing Section 1692e(10) violation); <u>see also</u> <u>Neild v. Wolpoff & Abramson, L.L.P.</u>, 453 F. Supp. 2d 918, 923 (E.D. Va.

---

29  "While protecting naive consumers, the standard also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and presuming a basic level of understanding and willingness to read with care." <u>Id.</u>

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 48 of 94

2006) (observing that "a plaintiff asserting a claim under [Section] 1692e need not prove actual reliance on a false representation").[30]

Here, the undisputed evidence establishes that:

Defendant sends NC Final Letters to borrowers who become 45 to 60 days' delinquent on their mortgages. (Docket Entry 51-6 at 45 (44:11 to 44:14).) Defendant usually sends such letters closer to 45 days' delinquency. (See id. (44:11 to 44:17).) These NC Final Letters specify that the borrower must pay a specific "Amount Due" (also called a "default amount") by a certain "'Expiration Date.'" (Docket Entry 51-4 at 2.) The "Amount Due" includes outstanding "late fees, insufficient funds (NSF) fees, and other fees and advances" (id. at 4). (See id. at 2.) The NC Final Letter "demand[s] that [the borrower] bring [her] loan current ('cure the default') by paying the [A]mount [Due]." (Id. at 2.) It further states:

> If full payment of the default amount is not received by us in the form of a certified check, cashier's check, or money order

30    Relying on out-of-circuit precedent dealing with a separate provision of the FDCPA, Defendant maintains that Plaintiffs must produce "'evidence of confusion (beyond their own) in the form of an objective measure, like "a carefully designed and conducted consumer survey."'" (Docket Entry 59 at 11 (quoting Sims v. GC Servs. L.P., 445 F.3d 959, 963 (7th Cir. 2006)).) For violations of Section 1692e, however, the test [in this Circuit] is the capacity of the statement to mislead; evidence of actual deception is unnecessary." National Fin., 98 F.3d 139; see also id. (explaining that "[t]he district court considered the impact of the defendants' notices on the 'least sophisticated consumers,' and correctly concluded that the false threats that legal action would be taken also violated § 1692e(10)").

on or before the Expiration Date, [Defendant] will accelerate the maturity date of [the] loan and upon such acceleration the ENTIRE indebtedness of the loan, including principal, accrued interest, and all other sums due thereunder, shall, at once and without further notice, become immediately due and payable. Acceleration of the sums secured by the mortgage also may result in the sale of the premises. Any such action will not take place before 45 days from the date of this notice.

If [the borrower] send[s] only a partial payment, the loan still will be in default and [Defendant] may keep the payment and still will accelerate the maturity date.

IF THE DEFAULT IS NOT CURED ON OR BEFORE THE EXPIRATION DATE, [Defendant] AND THE LOAN OWNER INTEND TO ENFORCE THE LOAN OWNER'S RIGHTS AND REMEDIES AND MAY PROCEED WITHOUT FURTHER NOTICE TO COMMENCE FORECLOSURE PROCEEDINGS. FORECLOSURE PROCEEDINGS WILL NOT BE COMMENCED UNLESS AND UNTIL ALLOWED BY APPLICABLE LAW. ADDITIONAL FEES SUCH AS FORECLOSURE COSTS AND LEGAL FEES MAY BE ADDED PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.

(Id. at 2 (emphasis in original).)

The NC Final Letter then itemizes the Amount Due. (See id. at 4.) Finally, its default section concludes by stating:

[The borrower] ha[s] the right to reinstate [the] loan after acceleration and the right to bring a court action or assert in the foreclosure proceedings the nonexistence of a default or any other defense to acceleration and sale. If [the borrower] reinstate[s the] loan after acceleration, the loan no longer will be immediately due in full.

(Id. at 4.)

The NC Final Letters in the record and the testimony of Defendant's pre-foreclosure employee who handled North Carolina reflect that Defendant employed a 50-day Expiration Date in North Carolina. (See Docket Entries 39-1 to 39-12; Docket Entries 39-16 to 39-19; Docket Entry 51-3 at 34 (33:2 to 33:6); Docket Entry 51-4

50

at 2; Docket Entry 53-5 at 2, 10; Docket Entry 53-7 at 2, 5, 8, 11; Docket Entry 56-11 at 2, 6, 9, 18.) However, Defendant (through its designated corporate witness) also testified that it used a 30-day Expiration Date for North Carolina. (See, e.g., Docket Entry 51-6 at 25 (24:21 to 24:24); see also id. at 7 (6:1 to 6:12 (discussing witness's role)).) Regardless, failure to pay any or all of the Amount Due by the Expiration Date "doesn't actually trigger anything" (Docket Entry 51-3 at 78 (77:24)). (See, e.g., id. (77:14 to 77:25).)[31] Instead, if a borrower makes either a partial payment of the Amount Due[32] by the Expiration Date, or a full or partial payment of the Amount Due following the Expiration Date and prior to the 122nd day of delinquency (see id. at 66 (65:10 to 65:17)), "[t]he whole process starts over" (id. at 58 (57:18)) and Defendant sends a new NC Final Letter when the account becomes 45 days past due. (See id. at 58 (57:6 to 57:24); see also id. at 51 (50:2 to 50:10 (explaining that, in North Carolina, "when the

_____

31 Although the NC Final Letters do not alert borrowers to this fact (see generally Docket Entry 51-4), if the NC Final Letter contains a 30-day Expiration Date, full payment of the Amount Due by the Expiration Date enables transfer of the loan out of the pre-foreclosure department and into the customer service department for servicing (see Docket Entry 51-3 at 87 (86:10 to 86:16)).

32 It remains unclear whether, for borrowers not identified with the X-Y code as problematic, Defendant imposes some minimal threshold for an acceptable partial payment or whether any amount (e.g., 1 cent, $5, etcetera) suffices. (See, e.g., id. at 51 (50:2 to 50:3 ("If a payment is received in the state of North Carolina, a new NOI will be sent.")), 58 (57:20 to 57:24 (confirming that, "if a customer in North Carolina makes a payment in response to an NOI, the whole process just starts over")).)

51

customer makes a payment and they're still in arrears, a new NOI will be generated and sent to the customer . . . . [a]s soon as the payment is applied")).)

Moreover, Defendant can only refer a loan to foreclosure once it reaches at least 120 days' delinquency.  See 12 C.F.R. § 1024.41(f)(1)(i).[33]  As such, Defendant refers loans to its foreclosure department between 120 and 126 days' delinquency (Docket Entry 51-3 at 43 (42:15 to 42:22)), although it typically applies a one-day grace period, waiting until at least the 121st day for such referrals (see, e.g., id. at 20 (19:13 to 19:14), 44 (43:8 to 43:10); Docket Entry 51-6 at 22-23 (21:20 to 22:18)).  The referral to the foreclosure department triggers the loan's acceleration.  (Docket Entry 51-6 at 30-34 (29:5 to 33:3 (discussing foreclosure and acceleration process, explaining that (1) "once the account is referred to foreclosure, that would be the acceleration of the loan," (2) "in [Defendant's] eyes, the acceleration of the loan takes place at that point in which it's referred from pre-foreclosure to foreclosure," and (3) "what is accelerating the maturity date of the loan is that transfer" from pre-foreclosure to foreclosure)); see also Docket Entry 51-1 at 142-43 (141:21 to 142:1 ("The referral of the loan to attorneys to begin foreclosure is the step to accelerate the loan? . . . Yes.")).)  Notably, failure to pay outstanding late fees and other

_____

33  Defendant's internal policy recognizes as much.  (Docket Entry 51-6 at 76-78 (75:3 to 77:9).)

expenses causes neither transfer to the pre-foreclosure department nor foreclosure itself. (<u>See, e.g.</u>, Docket Entry 51-1 at 87-88 (86:3 to 87:3), 99-102 (98:10 to 101:1), 109-15 (108:14 to 114:11).)

Finally, a borrower may reinstate a loan after a foreclosure referral. (<u>See, e.g.</u>, Docket Entry 51-9 at 40 (discussing reinstatement right in Smith's Deed of Trust); Docket Entry 66-8 (Smith reinstatement letters).) However, if a borrower reinstates a loan, the borrower must pay all intervening outstanding monthly payments, late fees, attorney's fees, and any other expenses Defendant incurs in connection with the foreclosure. (<u>See</u> Docket Entry 51-9 at 40; <u>see also</u> Docket Entry 66-8 at 2, 4-8, 10-13.)

Given this evidence, the NC Final Letters qualify as materially misleading, false, and deceptive under the FDCPA. For instance, although Defendant cannot accelerate or foreclose on a loan for failure to pay late fees and other expenses, the NC Final Letters demand full payment of such moneys as part of the Amount Due on pain of acceleration and foreclosure. In addition, contrary to the NC Final Letter's representation that, "[i]f full payment of the default amount is not received by [Defendant]" by "the Expiration Date, [Defendant] will accelerate the maturity date of [the] loan," which "may result in the sale of the premises" (Docket Entry 51-4 at 2), a borrower need only make a partial payment before the Expiration Date or a full or partial payment after the

53

Expiration Date to forestall acceleration and foreclosure. Finally, the NC Final Letter indicates that Defendant may proceed with the acceleration and foreclosure as early as "45 days from the date of [the NC Final Letter]" (id.) even though Defendant cannot refer a loan to foreclosure, thereby accelerating the loan, until at least 60 days from the date of the NC Final Letter.[34]

In short, the NC Final Letter contains misrepresentations that "would have been *important* to the consumer *in deciding how to respond* to efforts to collect the debt," Powell, 782 F.3d at 127 (emphasis in original), and also threatens "action[s] that cannot legally be taken or that [are] not intended to be taken," 15 U.S.C. § 1692e(5). Accordingly, the NC Final Letter violates Section 1692e. See, e.g., Hall v. Nationstar Mortg., LLC, 255 F. Supp. 3d 625, 632 (E.D. Pa. 2015) (finding Section 1692e(5) violation where

---

34 These undisputed facts outlined above hold true even for those borrowers whose payments Defendant rejected. First, these borrowers received the same misrepresentations regarding the quantity of the Amount Due and the potential for acceleration and foreclosure as soon as 45 days after the NC Final Letter. These borrowers also received the same misrepresentations regarding the full/partial payment options and deadline. For instance, if Defendant sent the NC Final Letter at 45 days' delinquency with a 30-day Expiration Date, a borrower could make a partial payment (e.g., one of the two months' overdue payments identified in the Amount Due) through at least the Expiration Date to avoid rejection under Defendant's employee's policy of accepting payments that bring an account less than 60 days' overdue. By way of further example, even assuming a letter mailed at 60 days' delinquency with a 50-day Expiration Date, the borrower would have an additional 10 days past the Expiration Date to pay the component of the Amount Due attributable to mortgage and escrow payments (i.e., monthly payments) to avoid acceleration and foreclosure.

the defendants "assert[ed] the possibility of something [i.e., a Sheriff's Office sale within three month] that simply was not going to occur, even if it could technically occur," explaining that, due to Sheriff's Office practices, the assertion that "a Sheriff's sale could occur within three months . . . . would be untrue as a factual matter"); Morgan v. Credit Adjustment Bd., Inc., 999 F. Supp. 803, 808 (E.D. Va. 1998) (finding Section 1692e(10) violation where "the notice could easily be interpreted by the least sophisticated consumer as creating a false sense of urgency" (citing "*The FTC Official Staff Commentary on the Fair Debt Collection Practices Act*, 53 Fed. Reg. 50097-50110 (1988) (stating that '[i]t is a violation to send any communication that conveys to the consumer a false sense of urgency')" (alteration in original))).

Defendant's arguments to the contrary do not alter this conclusion. First, Defendant's contentions regarding Smith's alleged lack of reliance on the NC Final Letters (see, e.g., Docket Entry 59 at 11-12) fall short because Smith need not prove reliance. See National Fin., 98 F.3d at 139 ("[T]he test is the capacity of the statement to mislead; evidence of actual deception is unnecessary."); Neild, 453 F. Supp. 2d at 923 (observing that "a plaintiff asserting a claim under [Section] 1692e need not prove actual reliance on a false representation").

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 55 of 94

Defendant further maintains that the NC Final Letters cannot qualify as deceptive because Defendant intended to accelerate a loan if it reached 121 days delinquency and, because "the [NC Final] Letters are silent as to what date acceleration will occur, . . . *postponing* acceleration based on receipt of a payment never changed the intent." (Docket Entry 59 at 8 (emphasis in original).) As part of this argument, Defendant emphasizes that if a borrower made a partial payment "the loan **would never leave [Defendant's] pre-foreclosure servicing process**, and **would remain on the path toward acceleration until it reached 121 days past due**." (Id. (emphasis in original).)[35]   However, this argument overlooks the fact that the NC Final Letters indicate that acceleration and foreclosure may occur as soon as 45 days from the date of the NC Final Letter. (See Docket Entry 51-4 at 2.)   In reality, though, using the latest possible date for sending the NC Final Letter and the longest possible Expiration Date, Defendant

_____

35  In this regard, Defendant maintains that "the Expiration Date is not meaningless.  A payment of the Default Amount made on or before the Expiration Date would be sufficient to bring the loan current, and remove the loan from the pre-foreclosure servicing department." (Docket Entry 68 at 12.)  Notably, this assertion remains true only for an NC Final Letter containing a 30-day Expiration Date, whereas Plaintiffs' NC Final Letters contained a 50-day Expiration Date. In any event, the NC Final Letters contain no information regarding the prospect of moving servicing of one's loan from the pre-foreclosure department to the customer service department.  (See generally Docket Entry 51-4.)  Instead, they discuss the prospect of acceleration and foreclosure if full payment of the Amount Due does not occur by the Expiration Date.

56

could not accelerate a loan until at least 60 days from the date of the NC Final Letter, a date at least 10 days after the Expiration Date. Thus, the NC Final Letters create a false sense of urgency, in violation of the FDCPA. See Morgan, 999 F. Supp. at 808.

In addition, contrary to the representation in the NC Final Letter, "partial payment" would trigger another NC Final Letter, not acceleration. In other words, if a borrower responded to one NC Final Letter by making a partial payment, the result would be another NC Final Letter, not acceleration. Finally, the NC Final Letter represents that acceleration "will" occur if the borrower fails to make "full payment of the default amount" (Docket Entry 51-4 at 2), which amount contains late fees and other charges (see id. at 2, 4). However, Defendant does not accelerate a loan for failure to pay such fees (see, e.g., Docket Entry 51-1 at 87 (86:3 to 86:19), 109-10 (108:14 to 109:23)), making this representation an improper threat under the FDCPA. See Hall, 255 F. Supp. 3d at 632. In any event, at a minimum, the fact that the borrower (1) had longer to pay before Defendant could accelerate the loan and (2) could pay a lesser amount than the specified Amount Due without triggering acceleration, constitutes information that "would have been *important* to the consumer *in deciding how to respond* to efforts to collect the debt," Powell, 782 F.3d at 127 (emphasis in original).

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 57 of 94

Defendant also argues that the NC Final Letter's representations regarding acceleration "[are] not material" because:

> The [NC Final] Letters disclose that the consumer has the right to reinstate the loan after acceleration, making the loan no longer due in full. Therefore, the "will accelerate" language is not material because the customer could bring her loan current after acceleration — just as she could before the Expiration Date — by paying the "Amount Due" and, thus, avoid foreclosure, just as Smith did.

(Docket Entry 59 at 9 (citation omitted).) This argument too fails. First, the record facts belie Defendant's contention that a borrower could reinstate her loan by paying only the Amount Due specified in the letter. (See, e.g., Docket Entry 51-9 at 40; see also Docket Entry 66-8 at 2, 4-8, 10-13.) Rather, to reinstate a loan, a borrower would have to pay additional monthly payments,[36] late charges, attorney's fees, and other expenses associated with the foreclosure. (Compare, e.g., Docket Entry 39-16 at 2 (specifying, in Smith's first NC Final Letter, Amount Due of $1,968.02 for missed payments beginning on July 1, 2014 (see Docket Entry 51-1 at 127-29 (126:13 to 128:10))), with Docket Entry 66-8 at 2-7 (demanding, in associated reinstatement letter, $17,248.88 to reinstate loan for missed payments beginning on July 1, 2014).)

---

36 Because Defendant sends the NC Final Letters once a borrower reaches 45 to 60 days' delinquency, an NC Final Letter reflects two months' overdue monthly payments and charges. As Defendant cannot accelerate a loan until it reaches four months' overdue, the right to reinstatement involves, at a minimum, payment of two additional overdue monthly payments.

58

Accordingly, knowing that one could make a partial payment of the Amount Due before the Expiration Date or a full or partial payment of the Amount Due after the Expiration Date to avoid acceleration, rather than having to pay a much higher price to reinstate a loan after acceleration, "would have been *important* to the consumer *in deciding how to respond* to efforts to collect the debt," Powell, 782 F.3d at 127 (emphasis in original).

Defendant's arguments regarding the foreclosure representations (see Docket Entry 59 at 12-13) fare no better. To begin, Defendant's assertion that the NC Final "Letters contain no material misrepresentation because they disclose that the borrower has the right to reinstate the loan, which would prevent foreclosure" (id. at 13), cannot stand for the reasons previously discussed. Moreover, Defendant's contention that the NC Final Letters contain no misrepresentations regarding foreclosure because the letters speak only of the conditional possibility of foreclosure (see id. at 12-13) overlooks two important aspects of the NC Final Letters. First, the NC Final Letters provide that "sale of the premises" may occur as soon as "45 days from the date of th[e NC Final Letter]." (Docket Entry 51-4 at 2.) In reality, though, foreclosure cannot occur until at least 60 days from the date of the NC Final Letter. The fact that the NC Final Letter later states that "[f]oreclosure proceedings will not be commenced unless and until allowed by applicable law" (id. (all-cap font

omitted)) does nothing to reduce this false sense of urgency, as the NC Final Letters do not disclose that Defendant cannot foreclose on a home until it qualifies as at least 120 days' delinquent (see id. at 2, 4, 6, 8). Second, the NC Final Letter falsely states that, "[i]f the default is not cured on or before the Expiration Date, [Defendant] . . . may proceed without further notice to commence foreclosure proceedings" (id. at 2 (all-cap font omitted)), because, as discussed, the default amount includes late fees and other charges, and Defendant never forecloses on a loan for failure to pay such charges. Thus, the NC Final Letter's representations regarding foreclosure violate the FDCPA. See, e.g., Hall, 255 F. Supp. 3d at 632; Morgan, 999 F. Supp. at 808.[37]

---

[37] In its reply in support of its Second Motion, Defendant cites Fisher v. Seterus, Inc., No. 19-CV-1382, 2019 WL 5865605, at *6 (D. Minn. Oct. 21, 2019), report and recommendation adopted, No. 19-CV-1382, 2019 WL 5865449 (D. Minn. Nov. 8, 2019) and Moore v. Seterus, Inc., No. CV 15-0612, 2016 WL 7374651, at *18 (S.D. Ala. Dec. 16, 2016), aff'd, 711 F. App'x 575 (11th Cir. 2017), in support of its contention that the NC Final Letters do not contain material misrepresentations regarding foreclosure. (See Docket Entry 75 at 11-12.) However, these decisions do not support that conclusion. For one, neither decision suggests that the relevant letters (sent to Minnesota and Alabama residents) contain the NC Final Letter's representation that "[a]ny such action will not take place before 45 days from the date of this notice" (Docket Entry 51-4 at 2). For instance, Fisher quotes the Minnesota letter as stating:

> Failure to cure the default will result in acceleration of the sums secured by the mortgage and may result in the sale of the property securing the loan. If you send only a partial payment, the loan still will be in default. Additionally, we may keep the payment and accelerate the maturity date.

60

In sum, the record establishes that the NC Final Letters qualify as "false, misleading, or deceptive in violation of [Section] 1692e" the FDCPA.  <u>Powell</u>, 782 F.3d at 126 (internal quotation marks omitted).  The Court should therefore grant Smith's request for summary judgment on her Section 1692e claim.[38]

---

> IF THE DEFAULT IS NOT CURED ON OR BEFORE THE EXPIRATION DATE, THE LOAN OWNER AND WE INTEND TO ENFORCE THE LOAN OWNER'S RIGHTS AND REMEDIES AND MAY PROCEED WITHOUT FURTHER NOTICE TO COMMENCE FORECLOSURE PROCEEDINGS. FORECLOSURE PROCEEDINGS WILL NOT BE COMMENCED UNLESS AND UNTIL ALLOWED BY APPLICABLE LAW ....

<u>Id.</u>, 2019 WL 5865605, at *1 (ellipsis and all-cap font in original).  <u>Moore</u> likewise contains no reference to a 45-day period, and instead recounts the "relevant part" of the Alabama letter as:

> IF THE DEFAULT IS NOT CURED ON OR BEFORE THE EXPIRATION DATE, THE LOAN OWNER AND WE INTEND TO ENFORCE THE LOAN OWNER'S RIGHTS AND REMEDIES AND MAY PROCEED WITHOUT FURTHER NOTICE TO COMMENCE FORECLOSURE PROCEEDINGS. FORECLOSURE PROCEEDINGS WILL NOT BE COMMENCED UNLESS AND UNTIL ALLOWED BY APPLICABLE LAW.  ADDITIONAL FEES SUCH AS FORECLOSURE COSTS AND LEGAL FEES MAY BE ADDED PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.

<u>Id.</u>, 2016 WL 7374651, at *18.  Moreover, neither decision addresses the issue presented here of threatening acceleration and foreclosure for failure to pay outstanding late fees and charges.  <u>See generally</u> <u>Fisher</u>, 2019 WL 5865605; <u>Moore</u>, 2016 WL 7374651.

38  Smith bases her Section 1692f claim on the same conduct as her Section 1692e claim.  (<u>See</u> Docket Entry 39, ¶¶ 108-28; <u>see also</u> Docket Entry 66 at 15 ("After completing discovery, Ms. Smith concurs that the improper behavior is covered by 1692e.").)  As Defendant maintains (<u>see</u> Docket Entry 59 at 14-15), and Smith concedes (<u>see</u> Docket Entry 66 at 15), Smith's Section 1692f claim should be dismissed in light of her successful Section 1692e claim.  <u>See, e.g.</u>, <u>Lembach v. Bierman</u>, 528 F. App'x 297, 304 (4th Cir. 2013) ("[T]he courts use § 1692f to punish conduct that [the] FDCPA does not specifically cover.  Because the [plaintiffs] rely on conduct that is covered by § 1692e and do not allege any separate or distinct conduct to support a § 1692f violation, their claim

61

## C. Plaintiffs' NCDCA Claims

Finally, as an alternative to their NCCAA claims (<u>see</u> Docket Entry 39, ¶¶ 129-47), Plaintiffs assert claims under the NCDCA (<u>see id.</u>, ¶¶ 148-73). "[P]rohibit[ing] unfair, deceptive, or fraudulent practices in the collection of debts," <u>DIRECTV, Inc. v. Cephas</u>, 294 F. Supp. 2d 760, 763 (M.D.N.C. 2003), the NCDCA applies to any "[d]ebt collector," defined as "any person engaging, directly or indirectly, in debt collection from a consumer except those persons subject to the provisions of [the NCCAA]," N.C. Gen. Stat. § 75-50(3) (internal quotation marks omitted). Because, as discussed above, Defendant does not qualify as a "'[c]ollection agency'" under the NCCAA, N.C. Gen. Stat. § 58-70-15(a), it remains subject to the strictures of the NCDCA as a debt collector, <u>see</u> N.C. Gen. Stat. § 75-50(3).

The NCDCA prohibits attempting to collect a debt "by means of any unfair threat, coercion, or attempt to coerce," N.C. Gen. Stat. § 75-51, including, <u>inter alia</u>, "[t]hreatening to take any action not in fact taken in the usual course of business, unless it can be shown that such threatened action was actually intended to be taken in the particular case in which the threat was made," N.C. Gen.

---

fails for this reason as well."); <u>Miller v. Trident Asset Mgmt., LLC</u>, No. CV 18-2538, 2019 WL 4467036, at *7 (D. Md. Sept. 18, 2019) ("In addition to the reasons previously stated, summary judgment in favor of [the d]efendant on the § 1692f claims is also appropriate because these claims are premised on the same factual allegations supporting the § 1692e(10) claims.").

Stat. § 75-51(7), or "[t]hreatening to take any action not permitted by law," N.C. Gen. Stat. § 75-51(8). The NCDCA further prohibits attempting to collect a debt "by any fraudulent, deceptive or misleading representation," N.C. Gen. Stat. § 75-54,[39] as well as "by use of any unconscionable means," N.C. Gen. Stat. § 75-55.[40] Unsurprisingly given the statutes' similarities, North Carolina courts "have found cases construing the parallel federal statute [the FDCPA] to be particularly instructive, though not binding," in interpreting the NCDCA. Reid v. Ayers, 138 N.C. App. 261, 263, 531 S.E.2d 231, 233 (2000).

---

39  As the North Carolina Court of Appeals has explained:

Under [North Carolina General Statute] § 75-54, unfair practices include conduct which is fraudulent, deceptive or misleading in debt collection. To prevail on a claim for violation of this section, one need not show deliberate acts of deceit or bad faith, but must nevertheless demonstrate that the act complained of possessed the tendency or capacity to mislead, or created the likelihood of deception.

Forsyth Mem'l Hosp., Inc. v. Contreras, 107 N.C. App. 611, 614, 421 S.E.2d 167, 169-70 (1992) (internal quotation marks omitted).

40  According to Plaintiffs:

While . . . North Carolina courts have not defined unconscionability in this context, the Eleventh Circuit examined this word in the FDPCA [sic] context and found "[t]he term [] means "having no conscience"; "unscrupulous"; "showing no regard for conscience"; "affronting the sense of justice, decency, or reasonableness."

(Docket Entry 66 at 24 (brackets in original) (quoting LeBlanc v. Unifund CCR Partners, 601 F.3d 1185, 1200 (11th Cir. 2010)).)

63

To bring a claim under the NCDCA, a plaintiff must establish three threshold requirements: "First, the obligation owed must be a 'debt'; second, the one owing the obligation must be a 'consumer'; and third, the one trying to collect the obligation must be a 'debt collector.'" Id., 531 S.E.2d at 233 (citing N.C. Gen. Stat. § 70-50(1)-(3)).[41]     No dispute exists regarding Plaintiffs' satisfaction of these three elements. (See, e.g., Docket Entry 58 at 23 n.8 (acknowledging that Defendant qualifies as a debt collector under the NCDCA).) However, "once the three threshold requirements in [S]ection 75-50 are satisfied, a claim for unfair debt collection practices must then meet the three generalized requirements found in [S]ection 75-1.1: (1) an unfair act (2) in or affecting commerce (3) proximately causing injury." Reid, 138 N.C. App. at 266, 531 S.E.2d at 235; see also Ross v. F.D.I.C., 625 F.3d 808, 817 (4th Cir. 2010) ("In addition to proving conduct prohibited under the NCDCA, an NCDCA plaintiff must also meet the three generalized requirements for all []UDTPA

_____

41  Under the NCDCA:

(1) "Consumer" means any natural person who has incurred a debt or alleged debt for personal, family, household or agricultural purposes.

(2) "Debt" means any obligation owed or due or alleged to be owed or due from a consumer.

(3) "Debt collector" means any person engaging, directly or indirectly, in debt collection from a consumer except those persons subject to the provisions of [the NCCAA].

N.C. Gen. Stat. § 75-50.

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 64 of 94

claims: (1) an unfair act (2) in or affecting commerce (3) proximately causing injury." (internal quotation marks omitted)).[42]

Against this backdrop, "Plaintiffs . . . move for summary judgment as to liability only, for [Defendant's] violations of North Carolina's unfair debt collection laws." (Docket Entry 51 at 21.) Because Plaintiffs focus the NCDCA argument in the memorandum in support of their summary judgment motion on whether or not Defendant committed an action that violated the NCDCA, without adducing evidence regarding their injuries from such violation (see id. at 21-26), it appears that they seek summary judgment only as to the issue of whether Defendant's actions qualify as a violation of the NCDCA. See Celotex, 477 U.S. at 322 (noting necessity of proving each element of claim on which party bears burden).[43]

---

42  "The determination of whether an act or practice is an unfair or deceptive practice that violates [Section] 75-1.1 is a question of law for the court." Gray v. North Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000); accord Forbes v. Par Ten Grp., Inc., 99 N.C. App. 587, 600, 394 S.E.2d 643, 650-51 (1990) ("Whether [the] defendants committed the alleged acts is a question of fact for the jury and, if so, whether the proven facts constitute an unfair or deceptive trade practice is a question of law for the court." (internal quotation marks omitted)).

43  Entitled "**Motion for Summary Judgment or Partial Summary Judgment**," Rule 56(a), as amended in 2010, states that "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a) (certain emphasis added). "Th[is] first sentence [wa]s added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed.

65

Conversely, Defendant seeks summary judgment on the grounds that Plaintiffs allegedly failed to establish a violation of the NCDCA as well as that they allegedly failed to demonstrate that any such

---

R. Civ. P. 56 advisory committee's notes, 2010 Amendment Subdivision (a) (emphasis added). "The subdivision caption adopts the common phrase 'partial summary judgment' to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion." Id. "Use of the word 'judgment' itself may be an unfortunate continued use of an inaccurate term, but the intent of the rule is clear." Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc., 791 F. Supp. 2d 626, 632 (E.D. Wis. 2011) ("conclud[ing] that [the plaintiff's partial summary judgment] motion is not barred because it has requested disposition of legal issues [namely legal issues related to agency elements] that make up parts of various claims, as permitted by Rule 56"); see also Hudak v. Clark, No. 3:16-cv-288, 2018 WL 1785865, at *3 (M.D. Pa. Apr. 13, 2018) ("Although the use of the word 'judgment' may be considered misleading, or even to be a misnomer, . . . this unfortunate yet necessary use of the word cannot serve to prevent the entry of summary judgment on an element of a claim to which [the p]laintiff is entitled."). In sum:

> [S]ince 2010, federal courts have repeatedly found that they are permitted to consider a motion for summary judgment on only a part of a claim. The procedural validity of granting summary judgment on only part of a claim is further reinforced by the language of [Rule] 56(g) which allows that even if a Court does not grant all the relief requested in a motion for summary judgment, it may still "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case;" thus illustrating that Rule 56 contemplates the possibility that summary judgment may be entered on less than a full claim and on one or fewer than all of the elements necessary to establish a claim.

Hudak, 2018 WL 1785865, at *2 (citations omitted); see also id. at *3 (granting partial summary judgment motion "as to the element of probable cause" and explaining that "[t]rial in this matter will be limited to the other elements necessary for [the p]laintiff to establish his claim and for [the d]efendants to establish any affirmative defenses they may raise").

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 66 of 94

violation "proximately caus[ed them] injury," Ross, 625 F.3d at 817 (internal quotation marks omitted).[44]

As to whether the NC Final Letters violate the NCDCA, Defendant largely repackages its FDCPA arguments. (See Docket Entry 58 at 23-25; Docket Entry 59 at 19-20; Docket Entry 68 at 20-22; Docket Entry 74 at 7-8; Docket Entry 75 at 8-9.) Those arguments fail for the reasons discussed in the prior subsection. In addition, Defendant maintains that Plaintiffs have failed to identify any threatened action that Defendant could not legally take or that Defendant did not generally take. (See Docket Entry 58 at 23-25; Docket Entry 59 at 19-20.) However, as previously discussed, the NC Final Letters state, inter alia, that Defendant will accelerate and may foreclose on a borrower's property if the borrower fails to make full payment of the specified Amount Due by

---

44   More specifically, Defendant asserts that Plaintiffs failed to prove a violation of North Carolina General Statute Section 75-51. (See Docket Entry 58 at 23-25; Docket Entry 59 at 19-20.) Defendant acknowledges that the Second Amended Complaint also raises claims under Section 75-54 and Section 75-55, but asserts that "[t]hese statutes contemplate specific acts not relevant here." (Docket Entry 58 at 25 n.9; Docket Entry 59 at 20 n.6.) That assertion lacks merit, as both statutes broadly prohibit certain conduct, namely attempting to collect a debt "by any fraudulent, deceptive or misleading representation," N.C. Gen. Stat. § 75-54, and "by use of any unconscionable means," N.C. Gen. Stat. § 75-55, and merely provide nonexhaustive lists of conduct that satisfies such criteria. See N.C. Gen. Stat. § 75-54 ("No debt collector shall collect or attempt to collect a debt or obtain information concerning a consumer by any fraudulent, deceptive or misleading representation. Such representations include, but are not limited to, the following[]. . . ."); N.C. Gen. Stat. § 75-55 ("No debt collector shall collect or attempt to collect any debt by use of any unconscionable means. Such means include, but are not limited to, the following[]. . . .").

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 67 of 94

the Expiration Date. (See Docket Entry 51-4 at 2.) The specified Amount Due, however, includes late fees and other charges (see id. at 4), and Defendant did not accelerate and foreclose for failure to pay such fees. (See, e.g., Docket Entry 51-1 at 87-88 (86:3 to 87:3), 99-102 (98:10 to 101:1), 109-15 (108:14 to 114:11).) Accordingly, the NC Final Letters attempt to collect a debt "by means of an[] unfair threat," in violation of North Carolina General Statute Section 75-51. Further, the various misrepresentations detailed in the prior subsection, including regarding the impact of a partial payment and the date by which Defendant could commence acceleration or foreclosure, violate the NCDCA's prohibition on attempting to collect a debt "by any fraudulent, deceptive or misleading representation," N.C. Gen. Stat. § 75-54, as well as "by use of any unconscionable means," N.C. Gen. Stat. § 75-55.

Notwithstanding the foregoing, Defendant urges summary judgment on the theory that Plaintiffs have not established that such violations injured them. More specifically, Defendant maintains that the record does not show (1) an injury caused by (2) Plaintiffs' reliance on the NC Final Letters. (See, e.g., Docket Entry 58 at 23, 25-28; Docket Entry 59 at 20-23.) Contrary to Defendant's contentions, Plaintiffs' evidence suffices to survive summary judgment.

Under Section 75-1.1, "'[w]hether there be a causal relation between the violation of the statute and the injury complained of is an issue of fact for a jury . . . .'" <u>Ellis v. Smith-Broadhurst, Inc.</u>, 48 N.C. App. 180, 184, 268 S.E.2d 271, 274 (1980) (ellipsis in original) (finding "a genuine issue of fact both as to the alleged misrepresentations and as to causal relationship between the alleged misrepresentations and plaintiff's [injury]"). Accordingly,

> [t]o survive summary judgment, the non-movant must bring forth "fact-specific and not merely speculative" evidence establishing the cause of her injury. If there are multiple possible causes for an injury, the plaintiff "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough."

<u>Ross</u>, 625 F.3d at 817 (citation omitted).

In this regard, Defendant contends that Plaintiffs failed to establish any emotional or economic injury. In particular, relying on <u>Ross</u>, 625 F.3d 808, Defendant maintains that a party must provide more than "conclusory testimony" of emotional injury to survive summary judgment. (Docket Entry 58 at 25-26 (urging summary judgment on the grounds that "Koepplinger ***did not provide any medical evidence or any other competent evidence aside from his self-serving, conclusory testimony***" (emphasis in original)); Docket Entry 59 at 21 (urging summary judgment on the grounds that "Smith did not provide ***any medical evidence or any other competent***

69

***evidence aside from her self-serving, conclusory testimony***"
(emphasis in original)).)   The Court should reject Defendant's
position on this issue.

As an initial matter, in <u>Ross</u>, the plaintiff alleged that the
defendant's "actions caused her to suffer numerous physical
ailments, including PTSD, sleep apnea, insomnia, ulcers, migraine
headaches, and a narrowing of her esophagus.  However, all of the
physicians who examined or treated [the plaintiff] for these
conditions have concluded that something other than [the
defendant's] alleged conduct caused [her] problems or that her
medical conditions were of unknown origin."   <u>Ross v. Washington
Mut. Bank</u>, 566 F. Supp. 2d 468, 480 (E.D.N.C. 2008) (citation
omitted), <u>aff'd sub nom.</u>, <u>Ross v. F.D.I.C.</u>, 625 F.3d 808 (4th Cir.
2010).   In addition, the plaintiff in <u>Ross</u> failed to mention the
defendant's actions on any of her multiple medical visits to any of
her doctors, instead "first mention[ing] the subject on the day
before [the] deposition," <u>id.</u>, of one doctor whom she had seen 21
times previously.   <u>See</u> <u>id.</u>   Thus, although the district court in
<u>Ross</u> recognized that a litigant's "testimony standing alone could
support an award of compensatory damages," <u>id.</u> at 480-81, it
concluded that, "[i]n light of the overwhelming, contradictory
medical evidence, [the plaintiff's] speculation fail[ed] to show
proximate cause under North Carolina law," <u>id.</u> at 481.

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 70 of 94

The United States Court of Appeals for the Fourth Circuit affirmed that conclusion, emphasizing that "[n]o physician who has treated [the plaintiff] has attributed any of her conditions to [the defendant's] alleged practices" and that "[the plaintiff] never mentioned [the defendant's] debt collection efforts to any of her doctors, with the lone of exception of [one doctor]," to whom she had during her 21 previous visits identified other sources of her ailments. Ross, 625 F.3d at 818. "Finding no support in the medical testimony," the Fourth Circuit explained, "the only evidence [the plaintiff] can bring forth are her own conclusory statements concerning emotional distress." Id. However, "[p]resented only with [the plaintiff's] conclusory assertions, no reasonable jury could find that [the defendant's] debt collection practices were the proximate cause of [the plaintiff's] non-economic injuries." Id.

Here, by contrast, no such "overwhelming, contradictory medical evidence," Ross, 566 F. Supp. 2d at 481, exists. Further, contrary to Defendant's assertions (see, e.g., Docket Entry 58 at 25-26; Docket Entry 59 at 20-21), Plaintiffs provided more than conclusory testimony regarding their emotional injuries. For instance, Koepplinger testified that, "[t]o [him] it looked like [he] was losing [his] house if [he] didn't make that payment by that date, and it was every time [he] got a letter [he] felt the same way, and it got so bad, to the point where [he] was very leery

71

about getting a padlock on [his] gate when [he] got back home . . . ." (Docket Entry 51-7 at 20 (19:19 to 19:24).) He also testified that "[he] was living with wondering if there was going to be a padlock on [his] fence when [he] got home" (id. at 125 (124:6 to 124:8)), and his

> thoughts were is it just they don't want [his] house yet? They can grab it at any time. It just -- [he] was really bothered by it; meaning, [he] didn't trust anything with this anymore, and [he] just wanted it to go away.
>
> And at that point and probably a little bit before this, [his fiancé] and [he] were discussing just getting another house and leaving this all behind just to get these people away because life was very hard with them. [He] didn't trust a damn thing. [He] didn't trust anything out of anything anymore.

(Id. (124:12 to 124:22).) He further testified that Defendant caused him "undue stress" (id. at 135 (134:17)), through "[t]he default letters, seeing that in black and white; they're going to take [his] house, they're going to take [his] house. No matter what [he] do[es], they're going [to] take [his] house" (id. at 135-36 (134:23 to 135:1)). (See also id. at 136 (135:23 to 135:24 ("[I]t was miserable. It made [him] unhappy.")).)

Smith also testified that the NC Final Letters caused her stress and depression. For instance, Smith testified that, at times, she felt so stressed that she wished to see a doctor, which she could not afford to do without receiving governmental aid that her pride would not permit her to accept, and that, at those times, "the worry and the fear was about being foreclosed on" (Docket

Entry 51-8 at 62 (61:2 to 61:3)). (See id. at 61-62 (60:2 to 61:3).) She further testified that "[t]he impact of the letter is opening up a letter, being depressed because you're reading a letter stating that if you do not pay this amount by this date, that they're accelerating your loan and foreclosing on -- on your home, because, yes, then you're worried now about losing -- losing your home." (Id. at 121 (120:14 to 120:20).)[45] By way of final example, she also testified that, "[w]hen [she] received the letters, [she] -- [she] felt depressed. [She] was worried about [Defendant] foreclosing on -- on -- on [her] home." (Id. at 165 (164:18 to 164:20).)

Moreover, contrary to Defendant's contentions (see, e.g., Docket Entry 58 at 27-28; Docket Entry 59 at 22), the above testimony identifies the NC Final Letters as the source of Plaintiffs' injuries. (See, e.g., Docket Entry 51-7 at 20 (19:19 to 19:24 (explaining that, "[t]o [Koepplinger,] it looked like [he] was losing [his] house if [he] didn't make that payment by that date, and it was every time [he] got a letter [he] felt the same way, and it got so bad, to the point where [he] was very leery about getting a padlock on [his] gate when [he] got back home. . . .")); Docket Entry 51-8 at 121 (120:14 to 120:20 ("The impact of the letter is opening up a letter, being depressed

_____

45 According to Smith's testimony, she understood that, in regards to a loan, acceleration meant that Defendant was "[a]ccelerating a loan faster to foreclose on you" (id. at 45 (44:12 to 44:13)). (See id. (44:5 to 44:13).)

because you're reading a letter stating that if you do not pay this amount by this date, that they're accelerating your loan and foreclosing on -- on your home, because, yes, then you're worried now about losing -- losing your home.")).)[46]  Thus, Plaintiffs have brought forth the "fact-specific and not merely speculative evidence establishing the cause of [their] injury," Ross, 625 F.3d at 817 (internal quotation marks omitted), required to survive summary judgment.

Because Plaintiffs seek only statutory damages (see Docket Entry 49 at 1 (stipulating that Plaintiffs do not seek actual damages)) and their NCDCA claims survive summary judgment in light of their asserted emotional injuries, the issue of economic injury does not affect resolution of Defendant's Motions.  However, a few points bear noting.  First, Defendant offers no support for its proposition that Plaintiffs must provide documentary evidence to establish the existence of their asserted injuries.  (See Docket Entry 58 at 26; Docket Entry 59 at 23.)  Second, Koepplinger specifically testified that, as a result of the NC Final Letters,

_____

46  In addition to arguing that the evidence reflects their detrimental reliance on the NC Final Letters, Plaintiffs assert that they need not prove detrimental reliance.  (See, e.g., Docket Entry 65 at 28 ("Although claims under [the UDTPA] based upon misrepresentations require proof of reliance, claims under the NCDCA do not.  . . . All Mr. Koepplinger must demonstrate is that [Defendant] committed an unfair act (as identified in the NCDCA) that proximately caused injury." (emphasis omitted)).)  Whatever the merit of Plaintiffs' contentions in other contexts, it remains difficult to see how the NC Final Letters could harm Plaintiffs if they did not believe (i.e., rely) on them.

he paid other creditors less money, resulting in higher interest payments. (See Docket Entry 51-7 at 131-33 (130:8 to 132:6), 134-35 (133:19 to 134:10).) Smith likewise testified that, due to an NC Final Letter, she paid Defendant money to which it lacked entitlement in 2017, namely taxes (and perhaps insurance) on her separate property that Defendant mistakenly added to her mortgage payment. (See Docket Entry 51-8 at 22-23 (21:16 to 22:20), 27-28 (26:10 to 27:8), 39-40 (38:18 to 39:13), 77-80 (76:13 to 79:7), 153 (152:2 to 152:23).) She further testified that, but for that NC Final Letter, she would have, inter alia, promptly paid an attorney handling her servicing dispute with Defendant rather than "hav[ing] to let him know that [she] would, you know, get him paid when [she] could, but it would be later" (id. at 159 (158:19 to 158:21)). (See id. at 159-60 (158:7 to 159:24).) Accordingly, Defendant's economic-injury arguments fall short.

In sum, the evidence establishes that the NC Final Letters violate the prohibitions of the NCDCA. In addition, accepting the evidence as true and drawing all reasonable inferences in Plaintiffs' favor, a reasonable factfinder could find that the NC Final Letters injured Plaintiffs. As such, the Court should grant Plaintiffs' Motion insofar as it seeks a determination that the NC Final Letters violate the NCDCA and deny Defendants' request for summary judgment on Plaintiffs' NCDCA claims.

75

## III. Class Certification

Having resolved the Summary Judgment Motions, the analysis now turns to Plaintiffs' Certification Motion. See Krakauer v. Dish Network, L.L.C., 925 F.3d 643, 654 (4th Cir.) ("Since the requirements of Rule 23 are often 'enmeshed in the factual and legal issues comprising the plaintiffs' cause of action,' the district court must rigorously examine the core issues of the case at the certification stage." (citation omitted)), cert. denied, __ U.S. __, 140 S. Ct. 676 (2019). Whether or not to grant class certification lies within the Court's discretion, see Doe v. Chao, 306 F.3d 170, 183 (4th Cir. 2002), aff'd, 540 U.S. 614 (2004), but Plaintiffs bear the burden of proving that their proposed classes fit the strictures of Rule 23, see Krakauer, 925 F.3d at 654. In this regard, Rule 23 authorizes a member of a class to sue on its behalf if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).[47]

---

47 The adequacy requirement involves two parts: (1) adequate counsel must represent the plaintiffs and (2) the plaintiffs must not possess interests antagonistic to the class. See Woodard v. Online Info. Servs., 191 F.R.D. 502, 506 (E.D.N.C. 2000).

76

In addition to satisfying these threshold requirements, known as "numerosity, commonality, typicality, and adequacy," Plaintiffs must also satisfy "an implicit threshold requirement that the members of a proposed class be readily identifiable," a requirement "sometimes called ascertainability." Krakauer, 925 F.3d at 654-55 (internal quotation marks omitted). After satisfying these threshold requirements, Plaintiffs must "demonstrat[e] that the proposed class fits into one of the specific forms of class adjudication provided by Rule 23(b). The provision relevant here is Rule 23(b)(3), which is the common vehicle for 'mass tort class actions,' which seek damages for widespread wrongful conduct." Id. at 655 (citation omitted).[48] More specifically:

> To obtain certification under [Rule] 23(b)(3), the plaintiff must show both that "[1] questions of law and fact common to class members predominate over any questions affecting only individual class members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The two requirements are unsurprisingly labeled "predominance" and "superiority."

Krakauer, 925 F.3d at 655 (final two sets of brackets in original).[49]

---

48  Plaintiffs expressly have moved to certify classes pursuant to Rule 23(b)(3). (See Docket Entry 52 at 1.)

49  Rule 23 identifies the following matters as "pertinent to" this assessment:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

Plaintiffs seek to certify two classes, one for their state-law claims (the "State-Law Class") and one for their FDCPA claim (the "FDCPA Class," and collectively, the "Classes"). (See Docket Entry 52 at 1.) In particular, Plaintiffs propose certifying the following:

> (1) <u>North Carolina State Law Class:</u> All consumers throughout the State of North Carolina who were sent a letter from [Defendant] substantially similar or materially identical to the NC Final Letters delivered to Plaintiffs.

> (2) <u>FDCPA Sub-Class:</u> All consumers throughout the State of North Carolina whose servicing rights were acquired by [Defendant] after their loan was in default and who were sent a letter from [Defendant] substantially similar or materially identical to the NC Final Letter delivered to Plaintiffs.

(<u>Id.</u>)[50] Defendant challenges the propriety of each class, with a

_____

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

[50] Plaintiffs exclude from the proposed Classes:

(a) any Judge or Magistrate presiding over this action and members of their families; (b) [Defendant] and any entity which [Defendant] has a controlling interest or which has a controlling interest in [Defendant] and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion.

(Docket Entry 53 at 12.)

particular focus on the State-Law Class. (<u>See generally</u> Docket Entry 69.) Defendant's contentions possess merit as to the State-Law Class, but not as to the FDCPA Class.

**i. Preliminary Matters**

As an initial matter, Plaintiffs contend, and Defendant does not dispute, both that their Classes satisfy the numerosity requirement and that their counsel qualifies as adequate. (<u>See, e.g.,</u> Docket Entry 53 at 13-14, 17; Docket Entry 69 at 8 (asserting only that "Plaintiffs fail to (i) demonstrate there are common questions of law or fact, (ii) show the named Plaintiffs' claims are typical, and (iii) establish they are adequate class representatives").) A review of the evidence supports Plaintiffs' contentions. (<u>See, e.g.,</u> Docket Entry 53-9 at 1-17 (identifying counsel's experience); Docket Entry 51-1 at 62-64 (61:21 to 63:12 (reflecting 9,300 defaulted loans in relevant period)).)[51] Accordingly, the Court should find that Plaintiffs have satisfied these two requirements for both Classes.

_____

51 Although this figure represents all loans that qualified as defaulted during the relevant period rather just at the time of Defendant's acquisition, as the FDCPA requires, "[t]he [C]ourt may certify a class based on a common sense estimation of the class size if the precise number of class members is unknown," <u>Talbott v. GC Servs. Ltd. P'ship</u>, 191 F.R.D. 99, 102 (W.D. Va. 2000). Assuming even one percent of these loans qualified as delinquent when Defendant acquired them, the class would contain nearly one hundred loans (which may or may not have multiple obligors). Even that lesser number represents a group sufficiently large to render "joinder of all members [] impracticable," Fed. R. Civ. P. 23(a)(1).

In addition, as Defendant asserts (see Docket Entry 69 at 24-25) and Plaintiffs tacitly concede (see Docket Entry 77 at 11), the FDCPA Class can only encompass individuals whose loans remained in default at the time Defendant acquired them. See 15 U.S.C. § 1692a(6)(F)(iii). Thus, the "after" in Plaintiffs' proposed FDCPA Class definition must become "when," such that it reads: "All consumers throughout the State of North Carolina whose servicing rights were acquired by [Defendant] when their loan was in default . . . ." Moreover, because Koepplinger does not fit this criteria, he cannot serve as a representative for this class. See East Tex. Motor Freight Sys. Inc. v. Rodriquez, 431 U.S. 395, 403 (1977) (reversing appellate court's class certification order because "the trial court proceedings made clear that [the plaintiffs] were not members of the class of discriminatees they purported to represent," explaining that "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members"). Similarly, because Plaintiffs' only remaining state-law claims involve the NCDCA, the State-Law Class remains limited to an NCDCA claim. See id.

### ii. FDCPA Class Analysis

Turning to the FDCPA Class, the evidence reflects the ascertainability of this Class. For instance, Defendant has identified all delinquent North Carolina loans and the contact information for the relevant obligors, as well as the dates upon

which it sent each NC Final Letter. (See Docket Entry 53-8 at 8-12 (7:18 to 11:5), 33 (32:14 to 32:22), 56-60 (55:15 to 59:23), 77 (76:2 to 76:7); see also Docket Entry 53 at 13 (contending that "class members are readily ascertainable as [Defendant] has produced a spreadsheet identifying all putative Class Members, their respective loan numbers, and their contact information").) In addition, Defendant can identify which of those loans remained defaulted as of the time of Defendant's acquisition by querying its database. (See Docket Entry 53-8 at 68-70 (67:12 to 69:15); see also Docket Entry 51-1 at 57 (56:2 to 56:8 (affirming that one could determine default status by looking at final data set for onboarded loans)).)

Likewise, Defendant (through its designated corporate representatives (see Docket Entry 51-1 at 7 (6:2 (identifying deposition as a "30(b)(6) oral deposition")); Docket Entry 53-8 at 8 (7:3 to 7:11 (discussing witness's role))) conceded that:

(1) "to determine every customer who was behind at the time that [Defendant] took over the loans, all we would need to do is look at these final data sets for every portfolio that was transferred . . . and count them up" (Docket Entry 51-1 at 57 (56:2 to 56:8));

(2) "[Defendant] is able to ascertain the status of a loan at the time that [Defendant] acquires the servicing rights" by "run[ning] a query [in its database] looking back at the timeframe

the loan was acquired" (Docket Entry 53-8 at 68 (67:8 to 67:10, 67:15 to 67:16)); and

(3) Defendant remains "confident that [it] would be able to ascertain whether or not a borrower had a monthly payment due and owing at the time [Defendant] acquired the rights" (id. at 70 (69:1 to 69:5)).

Nonetheless, Defendant now maintains that a file-by-file review of each borrower's loan documentation remains necessary to determine the loan's status at the time of acquisition. (See Docket Entry 69 at 24 ("Plaintiffs have not provided any evidence that the promissory notes of all putative class members contain the **same definition** of 'default' to obviate the need for a note-by-note review of the term." (emphasis in original)).) Defendant's argument lacks merit.

First, the testimony in this case reflects that Defendant, and the mortgage industry generally, looks only to monthly payments to determine a loan's status. (See, e.g., Docket Entry 51-1 at 93-102 (92:9 to 101:2), 110-11 (109:2 to 110:4).) Second, this case involves only Fannie Mae mortgages and the standardized Fannie Mae Notes in the record reflect the same definition of default (see Docket Entry 51-9 at 2, 4, 45; see also Docket Entry 51-1 at 93 (92:11 to 92:14 (testifying that, for Defendant's customers, "to satisfy the loan and the mortgage, the deed of trust states the principal and interest payments or tax -- escrow payments have to

82

be paid")")) — a definition that remains consistent throughout Fannie Mae's "Uniform Instruments" used for North Carolina mortgages, see https://singlefamily.fanniemae.com/legal-documents/ notes (last visited Apr. 29, 2020). Third, the NC Final Letters specify that the relevant loan qualifies as defaulted for "fail[ure] to pay the required monthly installments" (see, e.g., Docket Entry 51-4 at 4 ("The loan is in default because you have failed to pay the required monthly installments commencing with the payment due 11/01/2015.").) Accordingly, even if Defendant incorrectly deemed a loan defaulted for failure to pay monthly payments, it would still qualify as a debt collector under the FDCPA as to that loan. See Bridge, 681 F.3d at 359-60 & n.4. Under the circumstances, Smith has satisfied the ascertainability requirement.

Smith also satisfies the adequacy and typicality requirements. Indeed, Defendant does not challenge Smith's adequacy to represent the FDCPA Class. (See Docket Entry 69 at 24-28; cf. id. at 18 (arguing that, as to state-law claims, "Smith is an inadequate class representative because the payment history presents an evidentiary issue impeding her ability to establish reliance").) In any event, nothing in the record indicates that Smith possesses "any interests antagonistic to the class," Woodard v. Online Info. Servs., 191 F.R.D. 502, 506 (E.D.N.C. 2000), thereby making her an adequate representative, see id.

83

Nevertheless, Defendant contends that Smith does not qualify as typical. (See Docket Entry 69 at 27-28.) The premise underlying typicality "is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." Broussard v. Meineke Discount Muffler Shops, 155 F.3d 331, 340 (4th Cir. 1998) (internal quotation marks omitted). Thus, typicality occurs when a claim "arises from 'the same event or practice or course of conduct' and 'similarity of legal theory may control even in the face of differences of fact.'" Talbott v. GC Servs. Ltd. P'ship, 191 F.R.D. 99, 104 (W.D. Va. 2000); see also Woodard, 191 F.R.D. at 505 ("The class representative may satisfy th[e typicality] requirement by demonstrating that his claims arise from the same practices, and are based on the same theory of law, as the class claims.").

Defendant asserts that "Smith is not typical of the FDCPA Sub-Class because she admitted that approximately half of the letters that were sent on her Loan after servicing transferred to [Defendant] — those addressed to her ex-husband who passed away in 2011 — were never read by anyone." (Docket Entry 69 at 27-28.) That argument misses the mark. Smith (and the proposed class) seek recovery for the NC Final Letters sent to them, not to any co-borrowers. (See, e.g., Docket Entry 39, ¶ 50 (relying on "NC Final Letters sent to and received by Plaintiff Rhoda Smith"); Docket

84

Entry 52 at 1 (defining proposed FDCPA Class as North Carolina consumers "who were sent a[n NC Final L]etter from [Defendant]").)

"Here, all class members' claims are grounded in an identical practice and legal theory — the mailing of improper debt-collection letters in violation of the FDCPA." Woodard, 191 F.R.D. at 505. As such, "[t]ypicality is, by definition, inherent in [Smith's FDCPA C]lass, i.e., each class member was subjected to the same FDCPA violation as [Smith] when they were sent the [NC Final L]etter. Much like the facts in [Woodard and Talbott], typicality is satisfied because the named plaintiff's claim rests on the theory that [Defendant's] standard debt collection letter violates the FDCPA." Talbott, 191 F.R.D. at 104 (internal quotation marks omitted).

Next, the inquiry turns to the commonality requirement. To establish commonality, Smith must "demonstrate that the class members 'have suffered the same injury.'" Dukes, 564 U.S. at 350; see also id. (explaining that, to establish commonality, class members' "claims must depend upon a common contention" and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"). In regards to this requirement, Smith maintains:

> There is no dispute that the NC Final Letters were materially identical (and identifiable), and [Defendant]

85

had the common and automatic process of sending those
letters once loans became 45-60 days delinquent.  Here,
the common issue driving resolution of the litigation is
whether [Defendant's] pattern, practice, and policy of
collecting and/or attempting to collect debt through the
use of the NC Final Letter constitutes a violation of the
[FDCPA].

(Docket Entry 53 at 15 (footnotes omitted).)  In other words, Smith

argues that this lawsuit presents the common question of whether

Defendant's use of standardized NC Final Letters violates the

FDCPA.

Defendant raises two challenges to Smith's commonality

argument.  First, Defendant asserts that the FDCPA claims require

an individualized assessment of each consumer's situation and

Defendant's intentions.  (See Docket Entry 69 at 26 ("Yet as the

Eleventh Circuit recognized in *Landeros* [*v. Pinnacle Recovery,

Inc.*, 692 F. App'x 608 (11th Cir. 2017)], resolution of whether

the[ NC Final] Letters are false, deceptive, or misleading as to

acceleration or foreclosure will 'turn on the unique factual

circumstances' of each consumer's indebtedness (default status,

payment rejections, payment plans, acceleration, foreclosure, etc.)

and the intentions of [Defendant] as to each consumer (whether

[Defendant] actually intended to accelerate or foreclose based on

that consumers' factual circumstances).").)[52]  As the foregoing

_____

        52  Unlike here, Landeros involved a debt collection letter
with representations regarding reporting to the IRS about
forgiveness of debt associated with foreclosure of a loan, as well
as taxation of such forgiveness.  The Eleventh Circuit concluded
that "whether the letter was false or misleading turned on the

summary judgment analysis details, this contention lacks merit.
Defendant further argues that "[t]he determination of actual
damages will create unique, individualized issues because each
consumer will have a different reaction and response to the [NC
Final] Letters." (Id. at 27.) However, Smith does not seek actual
damages for the FDCPA Class. (See, e.g., Docket Entry 53 at 20
(explaining that FDCPA "prescribe[s] statutory damages as
penalties"); see also id. at 21 ("[The] FDCPA Sub-Class damage
calculations rely on a single theory related to the NC Final
Letter. Class Members would be awarded uniform damages because the
[FDCPA] prescribe[s] statutory damages on a per violation

---

factual circumstances particular to each recipient," Landeros, 692
F. App'x at 612, such that the plaintiffs could not satisfy the
Rule 23(b)(3) predominance criteria, see id. In so doing, the
Eleventh Circuit declined to apply the least sophisticated consumer
standard because, under its precedents, that "standard will not
apply to FDCPA claims in which the consumer's sophistication is
irrelevant." Id. at 613; see also id. ("The merits of the
[plaintiffs'] FDCPA claims do not turn on the sophistication of the
person who read the [defendant's] letter. Rather, the merits of
the claims depend on the objective factual circumstances unique to
each recipient's indebtedness. [Defendant's] statements about debt
forgiveness and the potential tax consequences would violate the
FDCPA because of the fact that [Defendant] did not intend to report
debt forgiveness as to that individual person or because of the
fact that that particular person's forgiven debt would not be
substantial enough to give rise to taxable income."). Landeros
lacks applicability to this matter, which (for reasons previously
discussed) involves objectively false statements not dependent on
such factual nuances.

Case 1:17-cv-00995-CCE-LPA   Document 79   Filed 04/29/20   Page 87 of 94

basis.").)[53] Accordingly, Defendant's contentions do not preclude a finding of commonality.

In this regard, "the existence of common questions of law *and* fact is clear. At issue is whether Defendant's debt collection letters, which are admittedly form letters," violate the FDCPA. Woodard, 191 F.R.D. at 505. "Th[is] issue[ is] shared by all class members, and [is] well-suited to disposal by class action." Id.; see also id. ("Here, all class members' claims are grounded in an identical practice and legal theory — the mailing of improper debt-collection letters in violation of the FDCPA."); Talbott, 191 F.R.D. at 103 ("Mailing a standardized collection letter satisfies commonality and has been the basis for certification in similar cases.") (collecting cases).

Moreover, the FDCPA claim satisfies the predominance requirement. See Talbott, 191 F.R.D. at 105 ("Here, common questions predominate because of the standardized nature of [the defendant's] conduct; namely the dunning letter and its FDCPA violation."). Indeed, "there are no material issues of law or fact that are *not* common to the entire class. The common material issue of fact is simply whether the class member received one of

---

53 Indeed, Smith argues that the fact the lawsuit seeks only statutory damages weighs in favor of finding predominance: "As the Fourth Circuit recently noted in *Krakauer*, such statutory damage awards promote the predominance of common issues by **'preventing the need to measure individual compensatory damages.'**" (Id. at 22-23 (emphasis in original) (quoting Krakauer, 925 F.3d at 658).)

Defendant's [NC Final L]etters, all of which contained the language in question, during the relevant time period." Woodard, 191 F.R.D. at 507. Whether the language in the NC Final Letter violated Section 1692e of the FDCPA serves as the "common material issue[] of law." Id. "No other significant issues exist, other than the simple tallying of who falls within the class and who falls outside." Id.

Finally, although Defendant does not contest this element for the FDCPA Class (see Docket Entry 69 at 24-28), Smith also satisfies the superiority requirement. As this Court explained in a similar consumer-protection lawsuit:

> A class action is the superior method of litigation in this case. Given the relatively small statutory damages, see [15 U.S.C. §1692k], the class members likely have little interest in controlling the litigation in this case. *See* Fed. R. Civ. P. 23(b)(3)(A); *Gunnells* [*v. Healthplan Servs., Inc.*], 348 F.3d [417,] 425 [(4th Cir. 2003)]; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 616-17 (1997); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533-34 (3d Cir. 2004). Further, the type of injury allegedly suffered by the class members is not, for example, a personal injury or death where a plaintiff would ordinarily have "a substantial stake in making individual decisions on whether and when to settle." *Amchem*, 521 U.S. at 616.
>
> There is no evidence of any litigation begun by or against any class members, *see* Fed. R. Civ. P. 23(b)(3)(B); *Gregory v. Finova Capital Corp.*, 442 F.3d 188, 191-92 (4th Cir. 2006), and given the large number of class members and claims, class-wide adjudication of the claims would be more efficient. *See Gunnells*, 348 F.3d at 432-33; *Warfarin*, 391 F.3d at 533-34. Adjudicating these claims in one forum would provide flexibility, control, and consistency that would not exist with individual litigation. *See* Fed. R. Civ. P. 23(b)(3)(C); *Gunnells*, 348 F.3d at 425. And, as

89

discussed *supra*, . . . individual issues do not present great difficulties in managing the class. *See* Fed. R. Civ. P. 23(b)(3)(D).

The Supreme Court has noted that, through Rule 23(b)(3), "the Advisory Committee sought to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (internal quotation marks and ellipsis omitted). Class-wide adjudication would achieve each of these goals.

Krakauer v. Dish Network L.L.C., 311 F.R.D. 384, 400 (M.D.N.C. 2015) (parallel citations omitted), aff'd, 925 F.3d 643 (4th Cir. 2019).

The Court should therefore grant Smith's request to certify the FDCPA Class, defined as: "All consumers throughout the State of North Carolina whose servicing rights were acquired by [Defendant] when their loan was in default and who were sent a letter from [Defendant] substantially similar or materially identical to the NC Final Letter delivered to Plaintiffs."

### iii. State-Law Class

However, the same result does not follow for Plaintiffs' State-Law Class. As discussed, to succeed on an NCDCA claim, a plaintiff must establish that the defendant's violation "proximately caus[ed him] injury." Reid, 138 N.C. App. at 266, 531 S.E.2d at 235. Defendant maintains that the Court may not certify this class because of "the unique issues related to each putative class member's reliance or injury" (Docket Entry 69 at 7).

90

Plaintiffs respond that the NCDCA does not require reliance and that, in any event, (1) they "demonstrated 'reliance,'" (2) "North Carolina law contradicts [Defendant's] claim that reliance precludes certification," and (3) the North Carolina Supreme Court "recognizes reliance can be proved circumstantially." (Docket Entry 77 at 4; see also id. at 3.)

As noted above, it remains unclear how the NC Final Letters could proximately cause an individual injury if the individual did not believe, i.e., rely, on the letter's statements. Plaintiffs fail to offer any insights into that issue. (See Docket Entries 53, 77; see also Docket Entries 65, 66, 73.) They also have not explained how they propose to circumstantially prove that the putative class members relied on the NC Final Letters. (See Docket Entries 53, 77.) Although the NCDCA provides for a per violation statutory damages award,[54] that provision does not negate the

---

[54] Defendant's contention that the NCDCA imposes a $4,000 cap per lawsuit rather than per violation (see Docket Entry 69 at 22-23) lacks merit. As an initial matter, it bears noting that the decision upon which Defendant relies for this proposition (see id. at 23 n.10 (citing "Ross, 566 F. Supp. 2d at 468")) misconstrues the decision upon which it relied. More specifically, it states that an earlier version of "section 75-56 imposes a cap on damages for a violation of the NCDCA, and does not impose a per violation penalty. See, e.g., Holloway v. Wachovia Bank & Trust Co., 339 N.C. 338, 342 & n. 2, 452 S.E.2d 233, 235 & n. 2 (1994)." Ross, 566 F. Supp. 2d at 483. Holloway involved a single violation of the NCDCA, and noted that the jury awarded the plaintiff $1,000 for that "'unfair act of debt collection' in violation of the [NCDCA]," which the North Carolina Supreme Court described as "the maximum penalty then allowed by th[e NCDCA]," id. at 342, 452 S.E.2d at 235. See id. at 343-44, 452 S.E.2d at 235-36. Second, and more importantly, the relevant statute here clearly provides for

necessity of establishing that the NC Final Letters caused each class member injury. (Cf. Docket Entry 77 at 10 ("Calculating damages here is as straightforward as in [Krakauer] — simply multiply the number of Letters by a per violation penalty. Class members who received more Letters will receive more damages." (emphasis in original)).)[55]

Further, given the parties' dispute regarding Plaintiffs' injuries, the Court cannot conclude that, qualitatively, the NCDCA liability issues "far exceed in complexity," Gunnells, 348 F.3d at 429 (internal quotation marks omitted), the injury issue. The putative class involves at least 9,300 members who received at

_____

statutory damages on a per violation basis. In this regard, the current version of the NCDCA states:

> Any debt collector who fails to comply with any provision of th[e NCDCA] with respect to any person is liable to such person in a private action in an amount equal to the sum of (i) any actual damage sustained by such person as a result of such failure and (ii) civil penalties the court may allow, but not less than five hundred dollars ($500.00) nor greater than four thousand dollars ($4,000) for each violation.

N.C. Gen. Stat. § 75-56(b) (emphasis added). Section 75-56(d) merely prohibits, in a private action, the trebling of such penalties under North Carolina General Statute Section 75-16.

55  This situation differs from the one in Gunnells, upon which Plaintiffs rely (see, e.g., Docket Entry 77 at 3-4), as that case involved the question of whether the plan administrator's actions caused the collapse of a health care plan, which collapse injured the putative class members, see Gunnells, 348 F.3d at 421-22. In Gunnells, the common question existed of whether the defendant's actions caused one specific event, see id. at 428-29, whereas here, the question remains whether thousands of letters injured thousands of individuals.

Case 1:17-cv-00995-CCE-LPA  Document 79  Filed 04/29/20  Page 92 of 94

least 66,218, and maybe as many as 150,000, NC Final Letters during the relevant time period.  (See Docket Entry 53-8 at 56-59 (55:15 to 58:12), 73-75 (72:24 to 74:17).)  In the absence of any explanation from Plaintiffs regarding how they can manageably establish these thousands of individual issues, Plaintiffs cannot show that the common question of Defendant's liability under the NCDCA predominates.

Accordingly, the Court should decline to certify Plaintiffs' State-Law Class.  See, e.g., Broussard, 155 F.3d at 342 ("agree[ing] that because reliance 'must be applied with factual precision,' [the] plaintiffs' fraud and negligent misrepresentation claims do not provide 'a suitable basis for class-wide relief'").

### CONCLUSION

Defendant solicits delinquent claims solely from Fannie Mae, precluding Plaintiffs' NCCAA claims.  Plaintiffs agree to dismissal of their UDTPA claims, which in any event fail as a matter of law. Defendant did not acquire Koepplinger's mortgage while in a state of default and thus the debtor exception precludes Koepplinger's FDCPA claim.  The record establishes that the NC Final Letters violate the FDCPA and the NCDCA's prohibitions.  In addition, a reasonable factfinder could find that the NC Final Letters injured Plaintiffs.  Finally, Smith has shown the propriety of certifying the FDCPA Class, but Plaintiffs have not shown that common issues predominate for their proposed State-Law Class.

93

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motions (Docket Entries 50, 54, 55) be granted in part and denied in part as follows: (1) summary judgment be granted to Defendant on Plaintiffs' NCCAA and UDTPA claims; (2) summary judgment be granted to Defendant on Koepplinger's FDCPA claim; (3) summary judgment be granted to Smith on her FDCPA claim; and (4) summary judgment be granted to Plaintiffs on the issue of whether the NC Final Letters violate the NCDCA.

**IT IS FURTHER RECOMMENDED** that the Certification Motion (Docket Entry 52) be granted in part and denied in part as follows: an FDCPA Class consisting of "all consumers throughout the State of North Carolina whose servicing rights were acquired by Defendant when their loan was in default and who were sent a letter from Defendant substantially similar or materially identical to the NC Final Letter delivered to Plaintiffs" be certified with Smith as the named plaintiff.

This 29th day of April, 2020.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

94